# Northwestern Journal of International Law & Business

Volume 40
Issue 2 *Winter*

Article 1

Winter 2020

# Alibaba, Amazon, and Counterfeiting in the Age of the Internet

Daniel C.K. Chow

Follow this and additional works at: https://scholarlycommons.law.northwestern.edu/njilb

 Part of the International Trade Law Commons, and the Internet Law Commons

## Recommended Citation

Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 Nw. J. Int'l L. & Bus. 157 (2020).
https://scholarlycommons.law.northwestern.edu/njilb/vol40/iss2/1

This Article is brought to you for free and open access by Northwestern Pritzker School of Law Scholarly Commons. It has been accepted for inclusion in Northwestern Journal of International Law & Business by an authorized editor of Northwestern Pritzker School of Law Scholarly Commons.

Copyright 2020 by Daniel C.K. Chow                                    Vol. 40, No. 2
Northwestern Journal of International Law & Business

# ALIBABA, AMAZON, AND COUNTERFEITING IN THE AGE OF THE INTERNET

*Daniel C.K. Chow*\*

*Abstract:*

*The advent of e-commerce marketplaces such as Alibaba and Amazon in the new millennium has led to the proliferation of the sale of counterfeit goods around the world through the Internet. Brand owners find that Internet counterfeiters operating in the digital world present even more challenges than those using only brick-and-mortar operations. Internet counterfeiters have unprecedented access to consumers. They use false identities and addresses and vanish into cyberspace at the first sign of trouble. Brand owners seeking help from Alibaba and Amazon to remove listings of counterfeits have become frustrated by their convoluted and labyrinthine notice and take-down procedures. Even when these procedures are used successfully, brand owners find that the process can take months only to have the counterfeiter reappear in short order using a new false identity. Many brand owners find that dealing with Alibaba and Amazon only adds to their misery and believe that both tolerate counterfeits as they earn revenue from all sales, including sales of counterfeit goods.*

*This Article sets forth for the first time how brand owners can use a set of currently available information technology tools to help create an effective deterrent to counterfeits on the Internet. Using these tools, brand owners can force counterfeiters to abandon the subterfuge and disguise that they rely on so that brand owners can—without the assistance of e-commerce platforms—directly pursue counterfeiters in civil and criminal actions in China where most of the counterfeiters are located and in the United States. The proposed approach should help deter counterfeiters who always work in secrecy and disguise by*

---

\* B.A., JD, Yale University. Bazler Chair in Business Law, The Ohio State University Michael E. Moritz College of Law. The author lived and worked in China as head of the legal department for a multinational company in the consumer products business with serious counterfeiting issues. The author also helped to organize and served as the first executive secretary for the China Anti-Counterfeiting Coalition, a lobby group for multinationals in China (now known as the Quality Brands Protection Committee), and was the principal author of the white paper on counterfeiting in China commissioned by the PRC State Council. More recently, in addition to academic duties, the author served as an attorney and expert witness in U.S. litigation involving the sale of counterfeit cigarettes and internet e-commerce sites in China and the United States. The opinions expressed in this Article are the author's own but the author has profited from many discussions with colleagues. The author also thanks Natasha Landon, Moritz Law Librarian for her excellent research help.

**Northwestern Journal of**
**International Law & Business**                    40:157 (2020)

*exposing them to what they fear and loathe the most: transparency and accountability for their illegal actions.*

158

TABLE OF CONTENTS

I. Introduction .................................................................. 160
II. Counterfeiting and the Internet....................................... 167
    A. Brief Overview of Counterfeiting in China...................... 167
    B. The Advent of the Internet ................................. 168
    C. Liability Regimes for Internet Service Providers.............. 171
    D. Alibaba ......................................................... 172
        1. Brand Owner Concerns...................................... 172
           a. Alibaba's Defense of Counterfeits ...................... 175
           b. Counterfeits for Sale on Alibaba........................ 176
        2. Alibaba's "Arrogance" and Illegal Activities ............. 179
           a. Specific Practices ..................................... 181
           b. Above the Law in China ................................. 183
    E. Amazon......................................................... 184
III. Entity Verification Measures and the Requirements of PRC
    Law ............................................................... 186
    A.   Problems with Enforcement ................................. 186
        1.  False Names, Identities, and Addresses. .................. 186
        2. Burdensome Notice and Takedown Procedures ......... 186
        3.  Lack of Deterrence..................................... 187
    B. Proposed Remedial Measures ................................. 188
        1. AIC Business License ................................... 188
        2. Legal Representative.................................... 190
        3. Verification and Deterrence ............................. 192
        4. Amazon and PRC Law.................................... 193
        5. Consent to Arbitration before CIETAC ................... 194
IV. Conclusion ................................................................. 195
V. Appendices.................................................................. 199
    Appendix 1. Alibaba Listing: Gucci Guccio Handbags......... 199
    Appendix 2. Alibaba Listing: Hennessy XO..................... 200
    Appendix 3. Alibaba Listing: Abercrombie & Fitch
        Sweatpants................................................... 201
    Appendix 4. Abercrombie & Fitch Sweatpants .................. 202

**Northwestern Journal of**
**International Law & Business**                                           40:157 (2020)

## I. INTRODUCTION

The advent of internet commerce (e-commerce) in the early 2000s coincided with the unprecedented and historic rise of counterfeiting in the People's Republic of China (PRC or China) that had begun in the 1990s.[1] Although sales of counterfeits through brick-and-mortar establishments had already gained a substantial share of the market in China by the early 2000s,[2] the rise of the Internet in the new millennium has allowed counterfeiters in China unparalleled access to consumers not just in China but also in the United States and worldwide by transcending the physical limitations inherent in the use of brick-and-mortar operations.[3] Recent studies show that counterfeits and infringing products have proliferated on the Internet and have reached levels of saturation that were unattainable by counterfeiters selling through brick-and-mortar distributors.[4] For example, Xinhua, China's official news agency stated that more than 40% of all goods sold online through Chinese e-commerce platforms in a recent year were "counterfeits or of bad quality."[5] Since Xinhua is controlled by the Communist Party of China (the Party) and would want to present China in the best light possible, the 40% figure might understate the severity of the problem. Most consumers in China believe that the likelihood of a product sold on the Internet is counterfeit is very high, and those who wish to buy genuine products avoid the use of the Internet altogether.[6] This 40% figure cited by Xinhua is double the estimated 15-20% rate of counterfeits sold in brick-and-mortar establishments in China.[7] In the United States, the U.S. General Accounting Office recently conducted a study and found that among a selection of 47 items belonging to four types of frequently counterfeited goods (i.e., sneakers, mugs, cosmetics, and phone chargers) purchased online, 27 were

---

[1]   *See* Daniel C.K. Chow, *Counterfeiting in the People's Republic of China*, 78 WASH. U.L Q. 1, 3 (2000).

[2]   By the early 2000s, brand owners estimated that counterfeits comprised 15-20% of all goods sold on the market in China. *See id.* at 3 n.3 (citing Joseph T. Simone, *Countering Counterfeiters*, CHINA BUS. REV., Jan. 1, 1999, at 12).

[3]   *See* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-18-216, INTELLECTUAL PROPERTY: AGENCIES CAN IMPROVE EFFORTS TO ADDRESS RISKS POSED BY CHANGING COUNTERFEITS MARKET 11 (2018), https://www.gao.gov/assets/690/689713.pdf (discussing how the use of the internet allows counterfeiters to transcend limits of brick and mortar counterfeiting) [hereinafter GAO REPORT].

[4]   *See infra* Parts II.A & II.B.

[5]   *More than 40 Per Cent of China's Online Sales 'Counterfeits or Bad Quality',* TELEGRAPH (Nov. 3, 2015), https://www.telegraph.co.uk/news/worldnews/asia/china/11971 401/More-than-40-per-cent-of-Chinas-online-sales-counterfeit-or-bad-quality.html. Xinhua does not distinguish between counterfeits and products of poor quality; it is unclear whether Xinhua believes that these are two separate categories of goods or a single category as most counterfeits are of poor quality.

[6]   This observation is based upon the author's own experience living and working in China and on discussions with colleagues and associates.

[7]   *See* Chow, *supra* note 1, at 3 n.3.

authentic and 20 were counterfeit.[8] After Seattle-based Amazon made efforts in 2015 to woo Chinese manufacturers to sell directly on its platform, complaints about counterfeits and infringing products sold on Amazon have risen sharply.[9]

Efforts by multinational companies (MNCs) that own trademarks (or brands), copyrights, and other intellectual property rights to stem the flow of counterfeits through the Internet have been largely unsuccessful, leading to anger and frustration.[10] Under current legal regimes, e-commerce platforms are in general not liable for counterfeits sold by third-party online vendors using the site;[11] liability lies with the vendor itself, but many brand owners argue that Internet commerce sites facilitate the sales of counterfeits.[12] E-commerce platforms earn revenues from sales, including sales of counterfeits.[13] Many brand owners argue that e-commerce platforms facilitate counterfeiting by allowing webpages or postings of counterfeit goods to remain on their sites despite the many protests of brand owners.[14] Some of these offending webpages are removed after brand owners suffer through a long and convoluted notice and takedown procedure only to reappear under a new false name and address in short order.[15] In China,

---

[8]  *See* GAO REPORT, *supra* note 3, at 15. The products were Nike Air Jordan shoes, Yeti travel mugs, Urban Decay cosmetics, and UL-certified phone chargers. *Id.*

[9]  Wade Shepard, *How Amazon's Wooing of Chinese Sellers Is Killing Small American Businesses*, FORBES (Feb. 14, 2017), https://www.forbes.com/sites/wadeshepard/2017/02/14/how-amazons-wooing-of-chinese-sellers-is-hurting-american-innovation/#13af78741df2.

[10]  *See infra* Parts II.B & II.D.

[11]  *See* Digital Millennium Copyright Act of 1998 (DMCA), 17 U.S.C. § 512 (Westlaw through Pub. L. No. 116-68) (creating a "safe harbor" from vicarious liability for ISPs that upon notification remove infringing material expeditiously). For cases holding that the ISP is not vicariously liable for the sale by third party vendors, s*ee generally Milo & Gabby, LLC v. Amazon.com, Inc.*, 2015 WL 4394673 (W.D. Wash. July 16, 2015); *Perfect 10, Inc. v. Amazon.com, Inc.*, 2009 WL 1334364 (C.D. Cal. May 12, 2009); *Hendrickson v. Amazon.com, Inc.*, 298 F. Supp. 2d 914 (C.D. Cal. 2003).

[12]  *See infra* Parts II.B, II.D & II.E.

[13]  *See* David Pierson, *Extra Inventory. More Sales. Lower Prices. How Counterfeits Benefit Amazon*, L.A. TIMES (Sept. 28, 2018), https://www.latimes.com/business/technology/la-fi-tn-amazon-counterfeits-20180928-story.html ("Not only has [Amazon] avoided any serious backlash for allowing the sale of fake goods, it's actually thrived from it, say more than two dozen brand owners, e-commerce consultants, attorneys, investigators and public policy experts.").

[14]  *See infra* Parts II.D & II.E.

[15]  *See* Pierson, *supra* note 13 ("[I]f Amazon shutters one store for selling knockoffs, the owner often shifts operations to another."); Alana Semuels, *Amazon May Have a Counterfeit Problem*, THE ATLANTIC (Apr. 20, 2018), https://www.theatlantic.com/technology/archive/2018/04/amazon-may-have-a-counterfeit-problem/558482/ ("'These problems come up once a week.'"). *Cf.* Jeff Bercovici, *Huge Counterfeiting Problem. This "Shark Tank" Company Is Fighting Back*, INC.COM (Apr. 2019), https://www.inc.com/magazine/201904/jeff-bercovici/amazon-fake-copycat-knockoff-products-small-business.html ("A recent Pointer report noted that Amazon in among the least responsive of all e-commerce platforms to takedown

**Northwestern Journal of
International Law & Business**                    40:157 (2020)

MNCs have waged a decades-long struggle against Alibaba to stem the sale of counterfeits with few tangible results.[16] Although Alibaba claims to have made many serious efforts in combatting the sale of counterfeit goods, many brand owners remain frustrated and dissatisfied.[17] As in the case of Alibaba, brand owners in the United States are frustrated with what they perceive to be Amazon's half-hearted efforts to battle the flow of counterfeits.[18] This Article examines counterfeiting on the Internet with a focus on Alibaba and Amazon, the largest e-commerce platforms in China and the United States respectively and in the world.[19] The lessons learned can be immediately applied to other e-commerce platforms.

This Article focuses on why the sale of counterfeits on the Internet has exploded and allowed counterfeiters to penetrate markets that were previously unavailable when counterfeiters were limited to brick and mortar operations. Not only has the Internet given counterfeiters vast new opportunities for profit but it has also allowed them to operate in the digital world in the open, while simultaneously being able to use false cyber identities and addresses to evade detection and capture by brand owners and law enforcement authorities.[20] With the emergence of the Internet, counterfeiting and piracy—already a worldwide problem—have entered into a new and even more potent phase.[21] Up to the present, MNCs have been frustrated by their inability to curtail the growth of counterfeits on the Internet.[22]

Although the problems created by the Internet are daunting, this Article argues that a simple and effective deterrent exists in China but has been overlooked or ignored by MNCs and e-commerce platforms and explains how this deterrent can be used effectively. This Article sets forth for the first time how these remedial measures can be used to curtail the explosion of

---

notices, removing only 25 percent of infringing listings.").

[16] *See infra* Part II.D.

[17] *See id.*

[18] According to one brand owner representative, "Amazon is making money hand over fist from counterfeiters, and they've done about as little as possible for as long as possible to address the issue." Ari Levy, *Amazon's Chinese Counterfeit Problem Is Getting Worse*, CNBC (July 8, 2016), https://www.cnbc.com/2016/07/08/amazons-chinese-counterfeit-problem-is-getting-worse.html. *See also* Semuels, *supra* note 15 (describing Amazon's low level of responsiveness to brand owner concerns).

[19] Alibaba is the world's largest e-commerce marketplace and Amazon is the second largest. *See infra* notes 103 & 107.

[20] *See* Pierson, *supra* note 13.

[21] *See* BUS. ACTION TO STOP COUNTERFEITING AND PIRACY & INT'L CHAMBER OF COMMERCE, ROLES AND RESPONSIBILITIES OF INTERMEDIARIES: FIGHTING COUNTERFEITING AND PIRACY IN THE SUPPLY CHAIN 5 (2015), https://iccwbo.org/publication/roles-respon sibilities-intermediaries/ ("The Internet has been particularly vulnerable . . . to counterfeiters and other criminal capitalizing on the success (and intellectual property) of legitimate businesses while remaining anonymous and avoiding detection.").

[22] *See infra* Part III.

counterfeits on the Internet. In setting forth this analysis, this Article will underscore the following three major points that must be understood by all MNCs and other brand owners in modern e-commerce.   First, the emergence of e-commerce platforms such as Alibaba and Amazon have given counterfeiters a vast new tool to reach end use consumers. Prior to the Internet, counterfeiters were subject to the physical limitations created by brick-and-mortar distribution and retail sites and were unable to penetrate distribution channels that would allow them to sell counterfeits in reputable retail outlets.[23] Consumers had to travel to less desirable locations to buy counterfeits as state-owned department stores and high end retailers in China and large reputable retail chains such as Walmart, Target, and Costco in the United States refused to deal with distributors of counterfeit goods.[24] Instead, consumers in China or the United States who wished to purchase counterfeits had to go to small discount stores, mom-and-pop stores, flea markets, street vendors, or private addresses in side streets, back alleys or other undesirable locations, a prospect that deterred many consumers.[25] The emergence of the Internet has now given what counterfeiters have always sought: a legitimate distribution channel that consumers can access at any time from their computers without having to travel to undesirable locations to buy counterfeits from brick-and-mortar sellers.[26] The Internet also gives counterfeiters the ability to disguise their identities and to disappear into the vastness of cyberspace at the first sign of trouble.[27] All counterfeiters and pirates, whether they sell in brick-and-mortar locations or through the Internet, are very fearful of detection and capture.[28] Counterfeiters that use brick-and-mortar establishments are subject to surprise raids and seizures by enforcement authorities,[29] but Internet counterfeiters have found ways to use false identities that are untraceable by brand owners; even when they are detected, Internet pirates that are shut down are able to immediately create new false identities and return to their illegal operations on the Internet.[30]

Second, PRC enforcement officials have recently acknowledged in an

---

[23]  *See* GAO REPORT, *supra* note 3, at 11.

[24]  This observation is based on the author's own experience as an attorney working for U.S. brand owners in tracking the distribution channel of counterfeits.

[25]  *Id. See* GAO REPORT, *supra* note 3, at 10 (counterfeits were traditionally sold in "underground" or secondary markets such as flea markets or sidewalk vendors).

[26]  *See* GAO REPORT, *supra* note 3, at 11–12.

[27]  *See id.*

[28]  This observation is based on the author's firsthand experience in pursuing counterfeiters.

[29]  *See* Chow, *supra* note 1, at 19 –21 (describing raids conducted in Yiwu City, "a significant wholesale distribution center for counterfeit goods in the PRC[,]" from 1998 to 1999).

[30]  *See* Pierson, *supra* note 13 ("[B]rands say the same fraudsters keep showing up under different names[.]"); Semuels, *supra* note 15 ("Milo and Gabby tried to track down the [counterfeit] sellers, but almost all of the sellers had given false names when setting up their Amazon seller accounts, and the addresses they gave turned out to be bogus as well[.]").

**Northwestern Journal of
International Law & Business**                                    40:157 (2020)

official report that Alibaba sees itself as above the law in China and feels no need to follow it.[31] MNCs have long suspected that Alibaba tolerates or encourages counterfeiting on its sites.[32] Brand owners have persistently complained that Alibaba and Amazon appear reluctant to assist brand owners in tracking down counterfeiters and create unnecessary bureaucratic and technical hurdles in the detection of counterfeiters.[33] Some brand owners have attributed these difficulties to an economic motive: e-commerce platforms earn revenue through sales, including sales of counterfeit goods.[34] In the case of Alibaba, brand owners have long suspected that it tolerates or supports counterfeiting and these sentiments have been confirmed by official statements by PRC enforcement authorities. According to PRC officials, Alibaba's attitude towards the law and enforcement authorities is marked by a fundamental "arrogance."[35] In China, it is not unusual for powerful entities to view themselves as above the law.[36] The Communist Party, the most powerful entity of all, sees the law as a mere instrument to be used to serve the ends of the Party.[37] Alibaba is not intimidated by or fearful of law enforcement authorities; to the contrary, Alibaba sees itself as more powerful than government law enforcement authorities and answerable only to the Party.[38] For these reasons, MNCs must accept the reality that Alibaba, in the words of PRC officials, tolerates and supports counterfeiters in order to protect its revenues from sales of counterfeit goods and that it will likely take an intervention by the Party at its highest levels to effect meaningful change in Alibaba's conduct. Any plan to stem the sales of counterfeits on Alibaba's platform that requires Alibaba's active participation must proceed with the assumption that it will be met with resistance or efforts that are half-hearted.

Third, although the use of the Internet to sell counterfeits presents formidable new challenges to brand owners, this Article argues that simple and effective measures are available under PRC law to brand owners to deter

---

[31] *See* Gongshang Zongju (工商总局), Guanyu Dui Alibaba Jituan Jinxing Xingzheng Zhidao Gongzuo Qingkuang de Baipishu (关于对阿里巴巴集团进行行政指导工作情况的白皮书), *translated in* STATE ADMIN. OF INDUS. & E-COMMERCE, PEOPLE'S REPUBLIC OF CHINA, WHITE PAPER ON ALIBABA GROUP HOLDINGS ADMINISTRATIVE GUIDANCE WORK SITUATION (2015) [hereinafter SAIC WHITE PAPER]. A partial English translation is available at Zheping Huang, *The Chinese Government Has Erased a Damning Report on Alibaba, but You Can Read It Here*, QUARTZ (Jan. 29, 2015), https://qz.com/335675/the-chinese-government-has-erased-a-damning-report-on-alibaba-but-you-can-read-it-here/. The SAIC White Paper is extensively discussed in Part II.B.

[32] *See infra* Part II.B.

[33] *See infra* Part III.A.

[34] *See e.g.*, Pierson, *supra* note 13 ("Not only has [Amazon] avoided any serious backlash for allowing the sale of fake goods, it's actually thrived from it, say more than two dozen brand owners, e-commerce consultants, attorneys, investigators and public policy experts.").

[35] SAIC WHITE PAPER, *supra* note 31, at 20.

[36] *See infra* Part II.D.2.b.

[37] *Id.*

[38] *Id.*

164

many counterfeiters from using the Internet and to detect and identify those that do.[39] This Article proposes and sets forth for the first time a set of simple and effective methods that MNCs can use to create effective deterrence to counterfeiting on the Internet.[40] To the best of the author's knowledge, no MNC, brand owner, or any professional or academic study has previously identified these methods, although they are openly available in plain sight in China's legal system, and their use is required and regularly encouraged by PRC officials. Although certain aspects of China's information technology industry, such as protection and enforcement of intellectual rights, are weak by comparison to the United States, other aspects of China's information technology industry are far ahead of the United States.[41] In particular, China's obsessive need to exert pervasive control over and to monitor its citizens and all aspects of Chinese society have created the informational technology tools available to deter counterfeiters.[42] In fact, Chinese government officials have urged Internet sites to use the tools available to control entry onto Internet sites and to monitor entities on the Internet.[43] Brand owners, however, either do not trust PRC officials or understand the potential effectiveness of these tools.

Unlike brick-and-mortar counterfeiters who need no permission to operate, counterfeiters must obtain a "pass" through a digital port of entry in order to obtain access to the Internet to sell their products.[44] Operators of e-commerce platforms have the ability to exercise absolute control over entry. Controlling this point of entry through the use of tools created by the PRC government is the key to controlling counterfeiting on the Internet. Counterfeiters wish to operate in hiding and secrecy; they fear and detest transparency and accountability. E-commerce platforms can remove the anonymity of the Internet by following a straightforward registration system

---

[39]  *See infra* Part III.

[40]  *Id.*

[41]  China is far ahead of the U.S. in the use of technologies, such as facial recognition, to closely monitor its citizens. *See* Zhou Jiaquan, *Drones, Facial Recognition, and a Social Credit System: 10 Ways China Monitors Its Citizens*, S. CHINA MORNING POST (Aug. 4, 2018), https://www.scmp.com/news/china/society/article/2157883/drones-facial-recognition-and-social-credit-system-10-ways-china.

[42]  China closely monitors its citizens. Recently, China announced a "social credit" system in which the activities of each citizen will be ranked, and each citizen given a score evaluating the social merit of his or conduct. For a discussion on how China monitors its citizens, *see* Charlie Campbell, *How China Is Using "Social Credit Scores" to Rewards and Punish Its Citizens*, TIME (Jan. 16, 2019), https://time.com/collection/davos-2019/5502592/china-social-credit-score/.

[43]  *See infra* Part III.

[44]  Online vendors are required by e-commerce platforms to register before they are allowed to access the site. *See e.g.*, *Selling on Amazon: Frequently Asked Questions*, AMAZON, https://services.amazon.com/selling/faq.htm (last visited July 1, 2019) (requiring a business name, address, and contact information among other information in order to open an Amazon seller account).

**Northwestern Journal of
International Law & Business**                    40:157 (2020)

as required by PRC law.[45] However, Alibaba does not faithfully apply the requirements of PRC law but instead is careless and loose in verifying entity registration.[46] Brand owners also complain that Amazon has lax registration requirements and registers many entities with fictitious identities and addresses.[47]

As a condition of gaining access to e-commerce sites, PRC law requires all vendors to submit a business license issued by PRC government authorities. These licenses have strict disclosure requirements that will reveal their true legal identities and locations in strict accordance with the detailed and specific information contained in official PRC government records and electronically on government websites to the public.[48] To obtain this official business license, business operators must undergo a review and approval process by PRC government authorities over the legality and economic feasibility of their proposed business operations.[49] Most counterfeiters will not wish to submit to such an approval process for fear of being detected and being subject to capture and prosecution. Those entities that do undergo this official review will then need to openly display their business licenses on the website In turn, counterfeiters will be unable to escape detection as brand owners will be able to bring suit directly against them.[50]

A unique concept of PRC law is that each business entity must have a natural person who serves as its legal representative and who is subject to civil liability and criminal prosecution.[51] The legal representative must be identified in the business license so brand owners will have a person in flesh and blood against whom they can directly file civil or criminal actions in China or in the United States if U.S. contacts exist.[52] The faithful execution of these requirements should help brand owners to deter many counterfeiters from selling through Internet sites. Currently, however, brand owners do not insist on enforcement of these requirements and neither Alibaba nor Amazon faithfully follows PRC law on entity registration.[53]

This Article will proceed as follows. Part II examines the background

---

[45]   *See infra* Part III.

[46]   *See* text accompanying notes *231-34 infra.*

[47]   *See infra* note 95.

[48]   *See* Administrative Measures for Online Trading, art. 23 (promulgated by the State Admin. of Indus. & E-Commerce, Order No. 60, Jan. 26, 2014, effective Mar. 15, 2014), CLI.4.218557(EN), http://en.pkulaw.cn/display.aspx?id=16309&lib=law&EncodingName= big5. *See also infra* Part III.

[49]   *See infra* Part III.

[50]   *Id.*

[51]   *See* General Principles of the Civil Law of the People's Republic of China, ch. III, art. 57 (promulgated by the Nat'l People's Cong., Order No. 66, Mar. 15, 2017, effective Oct. 1, 2017), *translated by* Whitmore Gray & Henry Ruiheng Zheng, *General Principles of the Civil Law of the People's Republic of China*, 34 AM. J. COMP. L. 715, 726 (1986) [hereinafter General Principles of the Civil Law of the PRC].

[52]   *See infra* Part III.

[53]   *Id.*

of counterfeiting in China and how the advent of the Internet has propelled this illegal activity to new heights. The ability to transcend the physical limitations created by brick-and-mortar counterfeiting operations has created a vast new opportunity in cyberspace for counterfeiters who can now compete directly with genuine goods and vanish at the first sign of trouble. Part II also discusses brand owner concerns about Alibaba and Amazon. In the case of Alibaba, brand owners have long claimed that Alibaba tolerates or supports counterfeiting on its websites. A recent in-depth investigation and report by PRC national authorities not only confirms this suspicion but also sets forth the PRC government's view that Alibaba sees itself as being above the law. Brand owners have also complained that Amazon is unresponsive to their concerns about counterfeits, requiring byzantine notice and takedown procedures that only add to brand owners' misery. Part III examines the hurdles that brand owners claim that they face in attempting to work with Alibaba and Amazon in removing infringing webpages or postings from their sites; these frustrations are due to cumbersome notice and takedown procedures that can take months and tax brand owners through heavy costs in time, energy, and money. Part III then sets forth this Article's proposed method of using existing online tools in the PRC to help create deterrents to counterfeiting on the Internet. These tools can be used to combat counterfeits on Alibaba and Amazon as well as on other e-commerce platforms. Part IV contains concluding observations.

## II. COUNTERFEITING AND THE INTERNET

### A. Brief Overview of Counterfeiting in China

As early as 2000, China was described as having the most serious counterfeiting problem in world history.[54] The origin of this problem can be traced to 1) China's access to advanced technology (i.e. intellectual property) brought into China by MNCs that make foreign direct investments in China and 2) to China's weak and developing legal system,[55] which does not create effective deterrence for counterfeiters and infringers of intellectual property rights.[56] Although U.S. companies have made many efforts through the first two decades of the twenty-first century to combat counterfeiting in China, China remains the largest source of counterfeits in the world. For example, a recent study cited in Forbes indicates that China produces 80% of the world's counterfeits and that counterfeiting is now a $1.7 trillion per year industry.[57]

---

[54] Chow, *supra* note 1, at 3. The background and history of the rise of counterfeiting before the advent of the internet is set forth in this article. *See infra* Parts II.A & II.B.

[55] DANIEL C.K. CHOW & THOMAS J. SCHOENBAUM, INTERNATIONAL BUSINESS TRANSACTIONS 537–38 (3d. ed. 2015).

[56] DANIEL C.K. CHOW & THOMAS J. SCHOENBAUM, INTERNATIONAL TRADE LAW 643 (3d. ed. 2017) (China's weak legal system does not create effective deterrence.).

[57] Wade Shepard, *Meet the Man Fighting America's Trade War Against Chinese Counterfeits (It's Not Trump)*, FORBES (Mar. 29, 2018), https://www.forbes.com/sites/wade

**Northwestern Journal of
International Law & Business**                          40:157 (2020)

The U.S. General Accountability Office reports that in 2016, 88% of all seized counterfeit goods by the United States originated from China and Hong Kong.[58] The European Union claims that China is the largest source of counterfeit goods sold into the EU.[59] Counterfeiting is now the largest criminal enterprise in the world,[60] and China is the epicenter of counterfeiting.[61] The highest number of shipments of counterfeits seized around the world originates from East Asia, with China as the top source.[62]

On April 3, 2019, the Trump Administration issued a Presidential Memorandum announcing that combatting counterfeiting and piracy had been elevated to a new level of priority for the United States.[63] The memorandum specifically tasked the Justice Department and the Department of Homeland Security to focus on and investigate "online third party marketplaces."[64] This indicates a recognition by the United States that counterfeiting on e-commerce platforms is a specialized priority area of concern.

## B. The Advent of the Internet

The rise of Internet sales platforms in the early 2000s created a valuable new opportunity for counterfeiters. To understand the significance of this development, it is necessary to recognize that there are two main components to counterfeiting: manufacturing and distribution.[65]

The manufacturing of counterfeits tends to arise in proximity to the manufacturing of genuine goods.[66] In the early 1990s, one of the first areas open to foreign investment in China was in the southern region of Guangdong Province, near Hong Kong. MNCs opened manufacturing facilities in special

---

shepard/2018/03/29/meet-the-man-fighting-americas-trade-war-against-chinese-counterfeits/#321a1941c0d6.

[58] GAO REPORT, *supra* note 3, at 13.

[59] EUROPEAN COMM'N, EU SEIZURES AT THE BORDER OF GOODS INFRINGING ON INTELLECTUAL PROPERTY RIGHTS (2018), https://ec.europa.eu/taxation_customs/sites/taxation/files/factsheet_ipr_report_2018_en.pdf.

[60] *See* Shepard, *supra* note 57 ("The trade in counterfeit and pirated goods is currently at $1.7 trillion . . . and is expected to grow to $2.8 trillion and cost 5.4 million jobs by 2022.").

[61] *See id. See also* EUROPEAN COMM'N, *supra* note 59 (reporting that China and Hong Kong, together, accounted for over 83% of counterfeit goods).

[62] OECD & EUROPEAN UNION INTELLECTUAL PROP. OFFICE, TRADE IN COUNTERFEIT AND PIRATED GOODS: MAPPING THE ECONOMIC IMPACT 49 (2016), http://dx.doi.org/10.1787/9789264252653-en.

[63] Memorandum on Combatting Trafficking in Counterfeit and Pirated Goods, Section 1 (Apr. 3, 2019), https://www.whitehouse.gov/presidential-actions/memorandum-combating-trafficking-counterfeit-pirated-goods/.

[64] *Id.*

[65] Daniel C.K. Chow, *Organized Crime, Local Protectionism and the Trade in Counterfeit Goods in China*, 14 CHINA ECON. REV. 473, 474 (2003).

[66] *Id.*

economic zones that created financial incentives for investment.[67] Soon after these facilities were established, the brand owners found that counterfeits began to appear in the same locations.[68] MNCs discovered that employees working in their facilities or their relatives, friends, or associates had begun to use the know-how that they acquired from the MNC to establish their own manufacturing operations in order to produce counterfeits.[69]

A counterfeiter that has manufactured a fake good must then sell it to consumers. The illegal factory may be located far away from densely populated urban areas where large numbers of consumers are found, so the counterfeiter must find a distribution channel for the goods to reach the end-use consumer. Distribution is the second major component of counterfeiting.

Prior to the rise of the Internet, counterfeiters faced a problem: legitimate distributors would have nothing to do with counterfeits.[70] MNCs distribute their products in China only through qualified distributors that are able to sell to high-end state-owned department stores and other retail outlets in high-end shopping centers.[71] Qualified distributors are those entities that are able to pass a stringent set of criteria established by brand owners.[72] These distributors will not work with counterfeiters for fear of losing their contracts with legitimate brand owners, and, as a result, counterfeiters are unable to penetrate into legitimate distribution channels to reach high-end retailers.[73] Rather, counterfeiters had to rely on brick-and-mortar wholesale distributors of lesser and questionable repute who would be willing to sell counterfeits, smuggled goods, and inferior quality products.[74] These wholesale distributors are found in markets in China that are either enclosed or open air spaces with hundreds or thousands of wholesale vendors.[75] Retailers appear at these wholesale markets with trucks or vans to transport the counterfeits purchased at these markets.[76] Large reputable retailers, such as state-owned department stores, do not buy at these wholesale markets.[77] Only retailers that are small mom and pop stores, street stalls, or open air vendors in China will purchase from these markets.[78] This left the counterfeiter with the problem that it could

---

[67]  *Id.*

[68]  *See id.* at 474–75.

[69]  This observation is based upon the author's own experience working as in-house counsel for an MNC with major operations in China. It is a pattern that is repeatedly occurs in China: counterfeiting tends to arise in locations with legitimate manufacturing operations.

[70]  *See* Chow, *supra* note 65, at 476.

[71]  *Id.*

[72]  *Id.*

[73]  *Id.*

[74]  *See id.* at 476–77.

[75]  *Id.* at 476.

[76]  *See* Chow, *supra* note 65, at 476.

[77]  *Id.*

[78]  *Id.*

**Northwestern Journal of
International Law & Business**                                    40:157 (2020)

almost never penetrate into high-end retail stores.[79] Purchasers of counterfeits would have to travel to side streets, back alleys, and other areas in less desirable urban locations to buy counterfeits from small and less reputable retailers.[80] The need to travel to unsavory locations deterred many consumers.

In the United States, counterfeits are also unable to penetrate into legitimate distribution channels to reach large department stores or other large retailers.[81] Counterfeits are almost never found in large chain stores such as Costco, Target, or Walmart. These companies either use qualified distributors or have vertically integrated business models that allow them to control distribution themselves.[82] These distributors refuse to deal in counterfeits, smuggled goods, or gray market goods.[83] Only less reputable distributors will deal in these secondary goods, but they do not sell to large and high end retailers who refuse to deal with them.[84] These distributors sell to discount stores, small mom-and-pop stores, street vendors, or private persons who arrange for sales through word of mouth.[85]The advent of the Internet has now given counterfeiters what they have long sought: a legitimate and broad-reaching distribution channel to reach retail consumers who are now able to purchase products without having to travel to specific and undesirable locations where counterfeits are sold. Counterfeiters can now place their products on the Internet to reach consumers worldwide and are no longer confined to using illegal wholesale markets to reach lower retail quality stores. While in the past, consumers would not encounter counterfeits on the next shelf adjacent to authentic goods in brick and mortar stores because high end retailers refused to deal with distributors of counterfeit goods, the same is no longer true on the Internet. It is now possible for counterfeits to be on the digital shelf next to genuine goods on the same or an adjacent webpage.[86] Counterfeits can now compete directly with genuine goods.[87] Counterfeiters can also use false digital images that hide the low

---

[79]  *Id.*

[80]  *Id.*

[81]  This observation is based on the author's own experience as an expert witness in U.S. litigation involving U.S. multinational companies in cases involving counterfeits from China.

[82]  *Id.*

[83]  Gray market goods (sometimes also called parallel imports) are genuine goods that are intended for sale in a foreign market but that are purchased abroad and shipped back to the home market. For example, genuine goods that are sold by the manufacturer to Japan are purchased by a foreign distributor in Japan who then resells them to an importer in China. The foreign distributor is able to take advantage of a lower price in Japan or favorable currency exchange rates in order to sell the products in China at a price that is lower than the genuine goods are sold directly by the manufacturer to buyers in China. See CHOW & SCHOENBAUM, *supra* note 55, at 567-68.

[84]  *See* Chow, *supra* note 65, at 476.

[85]  *Id.*

[86]  *See* GAO REPORT, *supra* note 3, at 11.

[87]  *Id.* ("In the past, consumers could often rely on indicators such as appearance, price, or

quality of their goods in competition with genuine goods.[88]

The rise of counterfeits coincides with shifts in consumer habits. In June 2000, approximately 22% of U.S. consumers purchased goods online, but by December 2016 that portion had risen to 79%.[89] By 2020, worldwide e-commerce sales are expected to reach $4 trillion, and e-commerce is expected to reach nearly 15% of global retail spending by 2020.[90]

Prior to the advent of the Internet, counterfeiters in China that sought to sell their goods in the United States loaded the goods in large shipping containers with false documentation to transport the goods by ocean carriage to a port in the United States.[91] While detection was difficult, if a brand owner had reliable specific intelligence of an illegal shipment,[92] customs authorities in the United States would open and inspect the container.[93] With Internet sales, thousands or hundreds of thousands of small, individual packages are now shipped to the United States by mail, making it nearly impossible to detect and stop these shipments.[94]

Not only do e-commerce platforms allow counterfeiters unprecedented access to end use consumers, counterfeiters are also able to take advantage of the anonymity of the internet to evade capture and detection by using false identities, business names, and locations.[95] The Internet has created an irresistible new opportunity for counterfeiters and has opened vast new avenues for generating profit.

## C. Liability Regimes for Internet Service Providers

Under the Digital Millennium Copyright Act (DMCA)[96] in the United

---

location of sale to identify counterfeit goods in the marketplace, but counterfeiters have adopted new ways to deceive customers.").

[88] *Id. Cf. id.* ("The physical appearance of counterfeit goods may no longer serve as a 'red flag' for consumers that the good they are considering purchasing is not genuine. Counterfeit goods and their packaging are becoming more sophisticated and closely resemble genuine goods[.]").

[89] *Id.* at 12.

[90] *Id.*

[91] *See* Chow, *supra* note 65, at 475.

[92] Such intelligence can be gathered through the use of private investigation companies that penetrate counterfeit rings. A number of companies, such as Kroll and Pinkerton, specialized in these investigations.

[93] The author was involved as an attorney in a counterfeiting case in the United States in which U.S. Customs authorities stated that they would be willing to conduct an inspection of shipping containers but only on the basis of reliable specific information.

[94] *See* Pierson, *supra* note 13 ("Customs agents had a fighting chance when pirated goods predominantly arrived in cargo containers. But with the rise of e-commerce, counterfeiters and their middlemen can ship goods in parcels too innumerable to catch.").

[95] *See id.* ("[B]rands say the same fraudsters keep showing up under different names[.]"); Semuels, *supra* note 15 ("Milo and Gabby tried to track down the [counterfeit] sellers, but almost all of the sellers had given false names when setting up their Amazon seller accounts, and the addresses they gave turned out to be bogus as well[.]").

[96] 17 U.S.C. § 512 (Westlaw through Pub. L. No. 116-68). DMCA implements two World

**Northwestern Journal of
International Law & Business**                    40:157 (2020)

States and similar provisions in China,[97] Internet service providers (ISPs) are not directly liable for the sale of counterfeits listed on their sites by third-party vendors.[98] While ISPs may be subject to vicarious liability for facilitating the sales, DCMA provides a "safe harbor."[99] ISPs are entitled to immunity from vicarious liability for third-party listings and sales of counterfeit goods if they have no knowledge of the infringing material and remove it expeditiously upon receiving notice of its illegal nature.[100] To implement DCMA and the corresponding PRC law, e-commerce companies such as Alibaba and Amazon have set forth internal notice and takedown procedures that brand owners are required to follow when they find infringing material.[101] As detailed in a later section, brand owners often complain that these procedures are cumbersome, time consuming, and ineffective.[102]

### D. Alibaba

### 1. Brand Owner Concerns

Alibaba is currently the world's largest e-commerce platform in the world.[103] In 2016, Alibaba's Internet marketplaces in China had 423 million

---

Intellectual Property Organization (WIPO) treaties: the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty. WIPO Copyright Treaty, Dec. 20, 1996, 112 Stat. 2861, 2186 U.N.T.S. 121; WIPO Performances and Phonograms Treaty, Dec. 20, 1996, 112 Stat. 2861, 2186 U.N.T.S. 203. As of 2007, the United States and the People's Republic of China are now contracting parties to both treaties. *Contracting Parties – WIPO Copyright Treaty*, WIPO, https://www.wipo.int/treaties/en/ShowResults.jsp?lang=en&treaty_id=16 (last visited July 1, 2019); *Contracting Parties – WIPO Performances and Phonograms Treaty*, WIPO, https://www.wipo.int/treaties/en/ShowResults.jsp? lang=en&treaty_id=20 (last visited July 1, 2019).

[97] *See generally* Trademark Law of the People's Republic of China (promulgated by the Nat'l People's Cong., adopted Aug. 23, 1982, most recently revised Apr. 23, 2019, effective Nov. 1, 2019); Law Against Unfair Competition of the People's Republic of China (promulgated by the Nat'l People's Cong., Order No. 10, Sept. 2, 1993, revised Nov. 4, 2017, amended Apr. 23, 2019).

[98] *See* 17 U.S.C. § 512(c)(1).

[99] *Id. See generally* Susanna Monseau, *Fostering Web 2.0 Innovation: The Role of the Judicial Interpretation of the DMCA Safe Harbor, Secondary Liability and Fair Use*, 12 J. MARSHALL REV. INTELL. PROP. L. 70 (2012).

[100] *See* 17 U.S.C. § 512(c)(1).

[101] *See Intellectual Property Policy for Sellers*, AMAZON, https://sellercentral. amazon.com/gp/help/external/201361070 (last visited July 1, 2019); *Intellectual Property Rights (IPR) Protection Policy*, ALIBABA, https://rule.alibaba.com/ rule/detail/2049.htm (last visited July 1, 2019).

[102] *See infra* Part III.

[103] Comment Submitted by Eric Pelletier, Vice President of Alibaba, to the Honorable Probir Mehta, Assistant United States Trade Representative re: 2016 Special 301 Out-of-Cycle Review Notorious Markets (Docket Number USTR-2016-2013), at 2 (Oct. 7, 2016), https://www.alizila.com/wp-content/uploads/2016/10/P-Alibaba-Group-Comments-for-2016-Notorious-Markets-Report-2_FINAL_compressed.pdf?x95431 (last visited Nov. 25,

active purchasers with a combined gross merchandise volume (GMV) of $485 billion.[104] In 2018, in the span of just two years, active purchasers in China grew to 636 million and GMV grew to exceed $768 billion,[105] creating the prospect that Alibaba's users may soon surpass one billion and its GMV may soon surpass $1 trillion, numbers that seemed almost inconceivable just a decade ago. In 2015, package delivery from Alibaba's e-commerce platform in China averaged thirty million per day.[106] The sheer size and scope of Alibaba's operations dwarfs even that of its closest competitors. For example, Alibaba's GMV in 2018 at $768 billion is more than three times that of Amazon, the world's second e-commerce platform, at $239 billion.[107]

From Alibaba's earliest days of operation, back in 1999, MNCs have claimed that counterfeits are abundantly available on Alibaba's websites.[108] Frustrated with the lack of results in China, U.S. companies have raised these concerns with the U.S. government and, as a result, Alibaba has been repeatedly placed on U.S. government blacklists. Despite its many claims that it is implementing new changes to effectively combat counterfeiting on its websites, Alibaba was first placed on the Out-of-Cycle Notorious Markets List in 2011[109] and sought to remove itself from the list in anticipation of its initial public offering (IPO) in the United States in 2014. Although Alibaba was dropped from the 2012 list,[110] Alibaba found itself once again on the

---

2019).

[104] *Id.*

[105] Press Release, Alibaba Group Announces December Quarter 2018 Results (Jan. 30, 2019), https://www.alibabagroup.com/en/news/press_pdf/p190130.pdf.

[106] Jen Wieczner, *Alibaba: Here's Why Our Mind-Blowing Numbers Are Real*, FORTUNE (Sept. 23, 2015), https://fortune.com/2015/09/23/alibaba-says-numbers-real-not-fake/.

[107] Adam Levy, *The 7 Largest E-Commerce Companies in the World*, THE MOTLEY FOOL (Dec. 26, 2018), https://www.fool.com/investing/2018/12/26/the-7-largest-e-commerce-companies-in-the-world.aspx.

[108] *See, e.g.*, *Alibaba and the 2,236 Thieves: An Online-Fraud Scandal in China*, THE ECONOMIST (Feb. 22, 2011), https://www.economist.com/newsbook/2011/02/22/alibaba-and-the-2236-thieves;

[109] OFFICE OF U.S. TRADE REPRESENTATIVE, 2011 OUT-OF-CYCLE REVIEW OF NOTORIOUS MARKETS 3 (Dec. 20, 2011), https://ustr.gov/sites/default/files/uploads/gsp/speeches/reports/2011/Notorious%20Markets%20List%20 FINAL.pdf (discussing Alibaba's subsidiary site Taobao.com).

[110] Doug Palmer, *U.S. Drops China's Taobao Website from "Notorious" List*, REUTERS (Dec. 13, 2012), https://www.reuters.com/article/net-us-usa-trade-piracy/u-s-drops-chinas-taobao-website-from-notorious-list-idUSBRE8BC1IG20121213.

**Northwestern Journal of**
**International Law & Business**                                           40:157 (2020)

Notorious Markets list in 2014[111], 2016[112], 2017[113], and 2018[114]. Furthermore, in 2016, a group of 17 international trade associations reiterated their concerns in a letter to USTR, stating:

> During the ten months since USTR published [the 2015 USTR Special 301 Notorious Markets Report] we have seen little evidence that there has been any noticeable change on the Alibaba platforms themselves; and at any given moment, a consumer around the world can chose from hundreds of thousands of counterfeit clothes, shoes, travel goods, handbags, toys, auto parts, jewelry, watches, furniture, electronics, pharmaceuticals, and other articles.[115]

Many brand owners have concluded that Alibaba, despite its protestations to the contrary, actually tolerates and supports counterfeiting on its websites because Alibaba earns revenues from all sales, including sales of counterfeit goods. Labelling Alibaba as "our most dangerous and damaging adversary,"[116] one brand owner stated:

> Alibaba's strategy has consistently been to provide lip service to supporting brand enforcement efforts while doing as little as possible to impede the massive flow of counterfeit merchandise on its platforms.[117]

---

[111] OFFICE OF U.S. TRADE REPRESENTATIVE, 2014 OUT-OF-CYCLE NOTORIOUS MARKETS LIST 8 (Mar. 5, 2015), https://ustr.gov/sites/default/files/2014%20Notorious%20Markets%20List%20-%20Published_0.pdf (discussing Alibaba's subsidiary site Taobao.com).

[112] OFFICE OF U.S. TRADE REPRESENTATIVE, 2016 OUT-OF-CYCLE NOTORIOUS MARKETS LIST 12–13 (Dec. 2016), https://ustr.gov/sites/default/files/2016-Out-of-Cycle-Review-Notorious-Markets.pdf (discussing Alibaba's subsidiary site Taobao.com).

[113] OFFICE OF U.S. TRADE REPRESENTATIVE, 2017 OUT-OF-CYCLE NOTORIOUS MARKETS LIST 20–23 (Jan. 11, 2018), https://ustr.gov/sites/default/files/files/Press/Reports/2017%20Notorious%20Markets%20List%201.11.1 8.pdf (discussing Alibaba's subsidiary site Taobao.com).

[114] OFFICE OF U.S. TRADE REPRESENTATIVE, 2018 OUT-OF-CYCLE NOTORIOUS MARKETS LIST 26–27 (Jan. 11, 2018), https://ustr.gov/sites/default/files/2018_Notorious Markets_List.pdf (discussing Alibaba's subsidiary site Taobao.com).

[115] Comment Submitted AFL-CIO et al. to the Honorable Probir Mehta, Assistant United States Trade Representative re: 2016 Special 301 Out-of-Cycle Review Notorious Markets (Docket Number USTR-2016-2013), at 2 (Oct. 26, 2016), https://www.mema.org/sites/default/files/resource/Multi-Org%20Letter%20on%20Alibaba%20102616.pdf.

[116] Letter from Lee S. Sporn of Michael Kors (USA), Inc. to Bob Barchiesi, President, International Anti-Counterfeit Coalition (IACC), at 2 (Apr. 21, 2016) [Hereinafter Letter from Lee S. Sporn]. *See* Erika Kinetz, *Some Howl Over Alibaba's Place in Anti-Counterfeiting Group*, ASSOC. PRESS (May 5, 2016), https://www.apnews.com/2c9381cb0c2841aba956abef1a3005b3.

[117] Letter from Lee S. Sporn, *supra* note 116, at 2. *See* Kathy Chu, *Brands Voice Doubts After Alibaba Joins Group Fighting Fake Goods*, WALL ST. J. (Apr. 28, 2016), https://www.wsj.com/articles/brands-voice-doubts-after-alibaba-joins-group-fighting-fake-goods-1461763178.

### a. Alibaba's Defense of Counterfeits

Many brand owners' skepticism about Alibaba's sincerity in combatting counterfeiting can be attributed to statements made by its Chairman and founder, Jack Ma, that defend counterfeiting. In responding to criticism by luxury brands about the sale of counterfeits on Alibaba, Ma made clear his position in 2015. A commentator observed:

> The longer Ma talks, the more it's clear where his sentiments fall. The second-richest man in China thinks the very idea of luxury retail—selling belts and accessories and the like for thousands of dollars—is inherently absurd. "How can you sell Gucci or whatever branded bag for so much money? It is ridiculous," he says. "I understand the branded companies are not happy, but I also say that's your business model. You have to check your business model, too."[118]

The following year, in a speech at Alibaba's headquarters, Ma stated:

> The problem is the fake products today are of better quality and better price than the real names. They are exactly the [same] factories, exactly the same raw materials but they do not use the names.[119]

These statements suggest that Ma believes that there is a normative justification for Alibaba's support of counterfeits. Ma believes luxury brands like Gucci are inviting unauthorized copies by charging prices so high that they are "absurd." Alibaba sees itself as helping out small-time sellers that sell counterfeits or infringing products to lift themselves into the middle class. Jack Ma and Alibaba take on a modern "Robin Hood" persona. Just as the fictional Robin Hood robbed from the rich to give to the poor, Alibaba is assisting small-time Chinese sellers to take a free ride on the goodwill of luxury brands owned by MNCs that have invited counterfeiting through their greed, avarice, and attempts to gouge vulnerable Chinese consumers. China's consumers also benefit from having access to fakes that are "of better quality and better price than thee real names."[120] Ma's position may help Alibaba to further gain popularity in China by enhancing Ma's reputation as a true national hero and great patriot of China, but it also infuriates brand owners.[121]

---

[118] Michael Schuman, *Why Alibaba's Massive Counterfeit Problem Will Never Be Solved*, FORBES (Nov. 4, 2015), https://www.forbes.com/sites/michaelschuman/2015/11/04/alibaba-and-the-40000-thieves/#31848fd729dc.

[119] Charles Clover, *Alibaba's Jack Ma Says Fakes Are Better Than Originals*, FIN. TIMES (June 14, 2016), https://www.ft.com/content/6700d5cc-3209-11e6-ad39-3fee5ffe5b5b.

[120] *Id.*

[121] *See* Letter from Lee S. Sporn, *supra* note 116. When Alibaba was accepted as a member of the International Anti-Counterfeiting Coalition, Sporn, who represents Michael Kors, a fashion house, resigned in protest. Chu, *supra* note 117.

**Northwestern Journal of
International Law & Business**                          40:157 (2020)

### b. Counterfeits for Sale on Alibaba

To test the claims of brand owners that counterfeits are found in abundance on Alibaba's sites, the author recently did a search of Alibaba sites and immediately found many examples of counterfeits and infringing products. Photographs of the webpages containing three of these examples are set forth in the Appendices. These examples are discussed below, but there are other examples on this site that are too numerous to discuss within the confines of this Article.

(a) Appendix 1 is an advertisement for handbags being sold under a "big brand name" ("Da Pai") called "Gucci Guccio." These handbags copy the design and trade dress of Gucci handbags and use the name "Gucci" as part of their brand name.[122] Gucci was singled out by Alibaba Chairman Jack Ma as a luxury brand owner selling its products at absurdly high prices.[123] The advertised price for these products is 1500 Renminbi ("people's currency" or RMB, the Chinese fiat currency). At the currency exchange rate of 1 RMB to 0.15 U.S. dollar, this price is the equivalent of about $225 U.S. dollars. On Gucci's website in the United States, genuine Gucci bags similar to the ones advertised on Alibaba sell for over $2000 U.S. dollars with some bags selling for as much as $7500.[124] It is highly unlikely for a genuine Gucci handbag of the type in this advertisement to sell for $225. It is also highly unlikely that these types of prices can be charged for gray market goods.[125] In addition, nothing in the advertisement indicates that these are second hand or used goods. Chinese consumers have an aversion to purchasing secondhand goods due to cultural reasons, and Chinese merchants are well aware of consumers' dislike of secondhand goods.[126] It is highly likely that the products advertised in the attached Alibaba webpage are counterfeits.

(b) Appendix 2 is an advertisement for a 700 ml bottle of Hennessy

---

[122] The author was told by an associate in China that Alibaba did not consider "Gucci Guccio" to be an infringing or counterfeit use because the name "Gucci" did not appear alone but was accompanied or modified by another name as part of the product's brand name. Only the unauthorized use of a trademark such as Gucci appears alone would be considered an infringing use.

[123] *See infra* text accompany note 117.

[124] *Women's Handbags*, GUCCI, https://www.gucci.com/us/en/ca/women/womens-handbags-c-women-handbags/1 (last visited July 1, 2019).

[125] While prices for gray market goods are usually lower than prices for genuine goods intended for the home market, the price differential would not be as great as that set forth in the case of the handbags in Appendix 1, i.e. it would be highly unlikely that a genuine handbag that sold for approximately $2,000 to $7,500 in Japan could be sold as a gray market good in China for $225. CHOW & SCHOENBAUM, *supra* note 55, at 567.

[126] *See* Yiling Pan, *Why the Second Hand Luxury Market isn't Thriving in China*, JING DAILY (Aug. 24, 2017), https://jingdaily.com/what-blocks-secondhand-luxury-market-thriving-in-china/ (last visited July 12 2019) (Chinese consumers "still prefer to purchase new luxury goods and look down on the value of second-hand goods").

XO cognac with an advertised price of 432 RMB or $65. A similarly sized bottle (750 ml) sells for approximately $160 in the United States.[127] It is highly likely that the bottle sold on the Alibaba website is a counterfeit.

(c) Appendix 3 is an advertisement for fashion workout pants made by Abercrombie and Fitch, based in Columbus, Ohio, selling at a price of 80 RMB or $12. Based on the photograph and the author's experience in tracking counterfeiters in the consumer products industry, it is apparent that these products are of low quality and are inferior to what Abercrombie and Fitch would sell in retail stores. By comparison, Appendix 4 includes a photograph of a similar Abercrombie and Fitch product from its website that sells for $58.[128] These facts indicate that it is highly likely that the product advertised on the Alibaba website is a counterfeit.

To understand why brand owners view examples such as these as threats to their business, it is necessary to realize that in China (as in many other countries) there is a huge appetite for counterfeit goods, and many consumers actively search for and buy counterfeits.[129] The vast majority of consumers in China who visit the webpages for the products described in the examples above are fully aware that these are counterfeit goods, but these consumers are actively seeking these goods.[130] In the case of counterfeit Gucci handbags and counterfeits of other famous brand names, consumers are actively seeking to buy cheap imitations of the famous brand that they can purchase for a tenth or less than the genuine product.[131] These consumers want the prestige of the brand, trademark, or trade dress and are not concerned about the quality of the actual merchandise itself.[132] So long as the product has the trademark or trade dress, the purchaser of the counterfeit is able to enjoy the

---

[127] *Hennessy Cognac XO*, WINE CHATEAU, https://www.winechateau.com/products/hennessy-cognac-xo (last visited July 1, 2019).

[128] *See* Appendix 4 *infra*.

[129] Jay Kennedy, *Commentary: More Buying Counterfeits and Knockoff - It's Costing Billions and More* (May 12, 2019), CHANNEL NEWS ASIA, https://www.channelnews asia.com/news/commentary/more-buy-knock-off-counterfeit-fake-goods-branded-drug-crime-11499382 (noting that "there are many consumers who willingly buy counterfeit goods"). *See also The Counterfeit Goods Industry in Modern China* (April 15, 2019), DAXUE CONSULTING, https://daxueconsulting.com/counterfeit-products-in-china/ (noting that "the market for fake goods in China is largely driven by consumers who actively search for and purchase counterfeit products").

[130] This observation is based on the author's own experience in China. *See* Liz Robbins, *Investigators Seize Fake Luxury Goods*, N.Y. TIMES (Aug. 16, 2018), https://www.nytimes.com/2018/08/16/nyregion/fake-luxury-goods-handbags.html.

[131] This observation is based on the author's work with private investigation companies tracking counterfeiters in China.

[132] *See* DANIEL C.K. CHOW & EDWARD LEE, INTERNATIONAL INTELLECTUAL PROPERTY: PROBLEMS, CASES, AND MATERIALS 784 (3d ed. 2017) (consumers will knowingly purchase fake luxury goods).

**Northwestern Journal of
International Law & Business**                                    40:157 (2020)

good will associated with the brand name or trademark.[133] In China today (as in many other countries), there is an enormous demand for counterfeit luxury branded handbags that offer the prestige of the genuine brand at a fraction of the price of the genuine product.[134]

The same is true with counterfeit liquor as shown in example (b) above. Consumers in China who purchase counterfeit bottles of famous brand name liquor are not in general buying the liquor for private or personal consumption.[135] In China, for personal or professional reasons, people often have banquets or dinners where highly alcoholic drinks are served and consumed in large quantities as part of social drinking rituals.[136] It is a mark of prestige for a host to serve a famous foreign brand of liquor, such as a French made cognac like Hennessy or a western brand of whiskey such as Johnny Walker Black Label.[137] There is a huge demand for this type of counterfeit liquor, where the counterfeiter uses a bottle that is either a copy or a genuine used bottle and fills it with a cheap but potent liquor.[138] The host can enjoy the good will of serving his guests a high prestige brand while only paying for a common liquor that, while inexpensive, is just as potent but is not contaminated or harmful to the guests.

In the case of (c), young adults in China are highly fashion-conscious and are hungry for famous international brands.[139] Most consumers viewing the webpage with Abercrombie and Fitch pants selling for $12 are fully aware that these are counterfeits and that the product is of low quality. They reason, however, that they can pay about the same price for a low-quality product without the prestige of the counterfeit Abercrombie label or pay a little bit more for the same low-quality product but enjoy the prestige of the Abercrombie brand name. Many consumers will choose the latter.[140]

---

[133] *Id.*

[134] *Id.*

[135] These observations about the use of alcohol in China are based upon the author's own experience and based on discussions with colleagues and associates.

[136] See Nathan H. Gray, *"Gan Bei": Business and Ritualistic Drinking in China*, WORD PRESS (Apr. 22, 2010), https://nathanhgray.wordpress.com/2010/04/22/gam-bei-business-and-ritualistic-drinking-in-china/ (discussing the importance of drinking rituals).

[137] *See* Jiani Ma, *Rich Post-80s Drive Chinese Whiskey Market Growth*, JING DAILY (Apr. 16, 2018), https://jingdaily.com/chinese-whiskey-market/ (noting the demand for premium and super premium brands of whiskey and cognac in China).

[138] Natalie Wang, *Nearly 40% of Chinese Consumers Admit to Purchasing Fake Booze*, THE DRINKS BUS. (Mar. 19, 2018), https://www.thedrinksbusiness.com/2018/03/nearly-40-chinese-consumers-admit-to-purchasing-fake-booze/ (noting that consumers admit to intentionally purchase fake booze in China).

[139] *See e.g.*, *Luxury Brands Tailor Their Marketing to Asian Millennial Consumers*, THE FASHION LAW (Aug. 7, 2018), http://www.thefashionlaw.com/home/luxury-brands-tailor-their-marketing-to-millennial-consumers-in-the-far-east.

[140] This observation is based upon the authors' experience in investigating counterfeit consumer products in China.

2. Alibaba's "Arrogance" and Illegal Activities

While MNCs have consistently complained about Alibaba's tacit approval and support of counterfeiting, these sentiments were recently confirmed for the first time by enforcement authorities in China in connection with an extraordinary national level investigation of Alibaba. The State Administration of Industry and Commerce (SAIC) and its local branches (AICs) are charged with maintaining orderly markets in the PRC and are primarily responsible for stemming the flow of counterfeit goods.[141] In the case of Alibaba, the SAIC took the unprecedented step of conducting an administrative guidance meeting with Alibaba officials in July 2014.[142] The Director of the SAIC emphasized the unique nature of the meeting when he stated, "For this meeting, I didn't know whether it's the first ever of its kind, or the last, but I hope that this would be the last time for a meeting of this nature."[143]

Enforcement actions are usually the provenance of local AICs as the SAIC, the central level authority, is a supervisory and policy-making body.[144] However, the SAIC believed that in the case of Alibaba, it was necessary for the agency to step in to resolve a case that had proven to be intractable to local authorities.[145] In the administrative guidance meeting, the SAIC and appropriate local level AICs met with Alibaba officials in order to set forth an agreed upon set of steps to remediate counterfeiting on Alibaba platforms.[146]

The administrative guidance meeting between the SAIC and Alibaba executives occurred on July 16, 2014,[147] and on January 28, 2015, the SAIC issued a White Paper as a follow up to the meeting to formally set forth a

---

[141] *State Administration of Industry and Commerce*, IP CHANNEL (Feb. 9, 2010), http://ip.people.com.cn/ GB/152255/10960401.html.

[142] *See* Transcript of Administrative Guidance Meeting Between SAIC and Alibaba (held July 14, 2016) (on file with author) [hereinafter Transcript of Admin. Guidance Meeting]; Huang, *supra* note 31 ("On July 16, 2014, the administrative guidance group of the Internet Supervision Department . . . held an administrative guidance forum at the Zhejiang Province Industry and Commerce Bureau. Principal officers and management teams of the core departments of Alibaba Group attended the meeting and accepted administrative guidance."). *See also* Heather Timmons, *Chinese Regulators Flagged Illegal Practices at Alibaba Months Before Its Monster IPO*, QUARTZ (Jan. 28, 2015), https://qz.com/334863/chinese-regulators-flagged-illegal-practices-at-alibaba-months-before-its-monster-ipo/. Administrative guidance is governed by the SAIC's Comprehensive Promotion of Administrative Guidance Work (2009).

[143] Transcript of Admin. Guidance Meeting, *supra* note 142, at 128.

[144] *State Administration of Industry and Commerce*, *supra* note 141 ("The [SAIC] . . . is the competent authority of ministerial level directly under the State Council in charge of market supervision/regulation and related law enforcement through administrative means.").

[145] *See* SAIC WHITE PAPER, *supra* note 31, at 11–12.

[146] The steps were later summarized in the SAIC White Paper. *Id.* at 19.

[147] *See id.*; Huang, *supra* note 31.

**Northwestern Journal of**
**International Law & Business**                              40:157 (2020)

plan of remediation.[148] In both the transcript of the meeting and in the SAIC White Paper, the SAIC makes the point repeatedly that at the time of the meeting in July 2014 there were numerous counterfeits, infringing products, and other violations of Chinese laws on advertising, product information, and licensing on Alibaba's websites.[149]

However, the point being made by the SAIC White Paper and during the administrative guidance meeting is more subtle, and even more deep-seated, than the need to control persistent illegal activities. For example, the SAIC states:

> Alibaba Group, for a long time, *has failed to take seriously* the operational violations on its e-commerce platforms and did not take effective measures to address the violations. This caused a miniscule issue to snowball into a serious problem, leading Alibaba to its greatest crisis since its incorporation.[150]

This critique is not directed at practices involving IP rights; it is directed at an underlying culture at Alibaba, which is one of viewing itself as above the law, including an attitude of a willful refusal to obey the law. At another point, the SAIC White Paper states:

> It is suspected that [Alibaba] knowingly, intentionally, by negligence or in spite of their presumed knowledge facilitates unlicensed operations, trademark infringements, untruthful publicity, pyramid schemes and violations of consumers' rights.[151]

The SAIC traces Alibaba's flouting of the law to an attitude of "arrogance."[152] An AIC official at the July 16, 2014 meeting stated that when speaking to Alibaba employees, he felt "a kind of arrogant emotion sprouting and growing."[153] In its White Paper, the SAIC specifically tells Alibaba that it should "redress arrogance."[154] The SAIC informs Alibaba that it cannot expect to "receive special treatment under law. . . . Regulators . . . shall treat businesses equally under law."[155] The SAIC also admonishes Alibaba to "ethically conduct business" and warns that "[a]n enterprise shall not get

---

[148] *See* SAIC WHITE PAPER, *supra* note 31. The purpose of the White Paper is to provide "various understandings and information about the said administrative guidance meeting" to Alibaba. *See id.* at 11.

[149] Transcript of Admin. Guidance Meeting, *supra* note 142, at 3–8.

[150] SAIC WHITE PAPER, *supra* note 31, at 11–12 (emphasis added).

[151] *Id.* at 14.

[152] *Id.* at 20.

[153] Transcript of Admin. Guidance Meeting, *supra* note 141, at 117.

[154] SAIC WHITE PAPER, *supra* note 31, at 20.

[155] "No market player shall receive special treatment under law. The management of Alibaba family shall understand their bottom line. Regulators in the applicable jurisdiction shall treat businesses equally under law." *Id.*

what it wants at its own will."[156] The SAIC additionally warns Alibaba that it cannot flout the law when it finds the law interferes with its interests and then assert the law when it needs the law's protection despite acting without credibility or integrity.[157]

Although the SAIC stood in the position of a government regulator at the meeting, it at times seemed to descend into the role of a sycophant flattering the Alibaba executives for the purpose of cajoling and pleading with them to respect the law. For example, at the administrative guidance meeting, AIC officials lavishly praised Alibaba, telling the executives how proud the PRC was of their accomplishment,[158] mentioning that all of the Alibaba executives at the meeting were "famous people"[159] and "big shots,"[160] and joking that the monthly salary of just one of the Alibaba executives were as much as the combined annual salaries of all the AIC officials present at the meeting.[161]

### a. Specific Practices

Alibaba's lack of respect for the law manifested in two practices that drew the SAIC's special attention and were the focus of discussion during the administrative guidance meeting: taking bribery from the platform participants and colluding with the counterfeiters. The SAIC states that "a large number of Alibaba staffers take business bribes in exchange for giving platform participants [preferential business opportunities] to squeeze out their competitors."[162] While Alibaba was already aware of the bribery problem and took some steps to control it, the AICs stated that bribery was still a problem as of the July 16, 2014 administrative guidance meeting,[163] and an Alibaba vice president at the meeting acknowledged that "temptation from the outside" is a problem among the Alibaba staff.[164] The SAIC also cited Alibaba employees' active participation in misleading consumers and committing various consumer protection violations. For example, the SAIC

---

[156] *Id.*

[157] "An enterprise shall not get what it wants at its own will, i.e. when needing credibility to protect an enterprise's interest, it boasts about credibility but throws the law away; when needing law to protect itself, it raises up high the flag of law but intentionally ignores its duties regarding credibility and integrity." *Id.*

[158] Transcript of Admin. Guidance Meeting, *supra* note 141, at 13.

[159] *Id.* at 39.

[160] *Id.*

[161] *Id.* at 109.

[162] SAIC WHITE PAPER, *supra* note 31, at 16.

[163] Transcript of Admin. Guidance Meeting, *supra* note 141, at 9 ("The sixth problem is what was included in governance, that is, the commercial bribery existing among the staff of Taobao.com. Suppliers and users of the platform are all involved. You have realized this problem and tried to keep it under control. However, the situation still exists.").

[164] Alibaba executive Xiaofeng Shao: "Recently, we have continued to improve the punishment system, even including the standards for our internal staff because this is also a big problem we face like the temptation from the outside." *Id.* at 92.

**Northwestern Journal of
International Law & Business**                                    40:157 (2020)

notes that "[s]ome of the online shops, through the trading with others, delete negative comments, providing business information to themselves and others that disrupts normal business order . . . . But [Alibaba's] supervision and punishment are not strict enough. There are staff in [Alibaba] involved in this violation."[165] A second set of practices involves Alibaba employees working together with counterfeiters, tipping the counterfeiters off to enforcement actions. For example, an SAIC official stated that in one instance the SAIC asked Alibaba for information about ten online stores suspected of selling counterfeits; although Alibaba provided the information, seven of the stores promptly closed, two cancelled their accounts, and one started to sell authentic products.[166] The SAIC concluded that "[t]his indicated information disclosure by your company staff"[167] to the counterfeiters. In another instance, the SAIC stated that after local AICs provided Taobao, an e-commerce platform owned by Alibaba, with information about their investigations, Taobao was suspected of tipping off counterfeiters and manufacturers of illegal narcotics.[168]

The unlawful activities by Alibaba employees discussed at the administrative guidance meeting in July 2014 came just three years after a major scandal in 2011 that involved about 100 Alibaba employees, including supervisors and sales managers, who after an internal investigation were found to be directly responsible for allowing over 2,300 China Gold Suppliers to defraud international buyers.[169] Long time CEO David Wei Zhe and COO Elvis Lee Shi Huei were forced to resign as a result of the scandal.[170] According to news reports, Alibaba lost $933 million in market share due to the scandal.[171] Three years after this scandal, according to the SAIC, numerous members of Alibaba's staff continued to conduct illegal activities adding further to its perception of a culture of lawlessness at Alibaba.

---

[165] *Id.* at 10.

[166] *Id.* at 11.

[167] *Id.*

[168] SAIC WHITE PAPER, *supra* note 31, at 17.

[169] Pascal-Emmanuel Gobry, *Huge Fraud at China E-Commerce Giant Alibaba.com: Management Out, 100+ Employees Dismissed*, BUS. INSIDER (Feb. 21, 2011), https://www.businessinsider.com/alibaba-ceo-resigns-over-huge-fraud-scandal-2011-2; Kelvin Soh, *Alibaba.com CEO Resigns After Jump in Fraudulent Sales*, REUTERS (Feb. 21, 2011), https://www.reuters.com/article/us-alibaba/alibaba-com-ceo-resigns-after-jump-in-fraudulent-sales-idUSTRE71K1QA20110221 ("'Members of our company's senior management knew of a noticeable increase of fraud claims by global players against China Gold Supplier customers on the international marketplace that began in late 2009,' Ma said in the statement.").

[170] Gobry, *supra* note 169; Soh, *supra* note 169.

[171] Mark Lee, *Alibaba Shares Tumble After Fraud Leads to CEO Departure*, BLOOMBERG (Feb. 22, 2011), https://www.bloomberg.com/news/articles/2011-02-22/alibaba-comdowngraded-by-morgan-stanley-after-ceo-wei-resigns.

### b. Above the Law in China

Alibaba's "arrogance" needs to be understood in the context of China's legal and political culture. In China today, it is not unusual for powerful entities to routinely disregard the law. In general, the more powerful an entity, the less compelled it feels to follow the law. Alibaba is among a handful of the most powerful entities in China. As a mundane example familiar to every citizen in China, cars registered to the People's Liberation Army ("PLA") do not obey traffic laws.[172] Every car registered to the PLA has a special license plate. These cars will routinely drive through red lights, speed, and refuse to pay tolls. Under China's current security systems, cars that drive through red lights are recorded by cameras stationed at every traffic stop, and letters containing fines are sent to transgressors. PLA cars, however, do not pay fines. No regular police officer with the Public Security Bureau will dare to stop a PLA car for a traffic violation, and no toll collector will dare to challenge a PLA car that refuses to pay the toll. This is a deeply embedded cultural attitude that starts at the top with the most powerful entity of all in Chinese society: the Communist Party, which views itself as above the law and views the law as a mere instrument for it to use to achieve its own ends.[173] These Party attitudes will be familiar to Jack Ma, the chairman of Alibaba, who is also a member of the Communist Party,[174] as are other senior Alibaba executives.[175]

As noted earlier, Alibaba's size is prodigious, and its financial power overwhelming.[176] In China today, an entity that is as large and powerful as Alibaba does not believe that it needs to answer to lowly government enforcement officials. Alibaba executives, such as Chairman Jack Ma, himself a Communist Party member, and other senior Alibaba officials who are also Party members, believe that they do not answer to the law but only to the Party, the ultimate authority in China.[177] One example of the close link between Alibaba and the Party is that Alibaba runs China's new social credit system.[178] Alibaba assigns a three digit score (from 350 to 950) to each citizen in China based on the social desirability of the citizen's conduct,

---

[172] The author has witnessed these practices by the PLA firsthand in China.

[173] DANIEL C.K. CHOW, THE LEGAL SYSTEM OF CHINA IN A NUTSHELL 62 (3d ed. 2015): "[N]either Imperial China nor pre-reform modern China recognized or accept the rule of law . . . . [T]he Communist Party views itself as holding unchallenged authority. In modern China, the Communist Party is supreme."

[174] Li Yuan, *Jack Ma, China's Richest Man Belongs to the Communist Party. Of Course.*, N.Y. TIMES (Nov. 27, 2018), https://www.nytimes.com/2018/11/27/business/jack-ma-communist-party-alibaba.html.

[175] The author has personal knowledge that senior Alibaba officials are Party members from his current work as a legal expert in litigation involving China.

[176] *See supra* text accompanying notes 103–107.

[177] This observation is based upon the author's own assessment and analysis.

[178] Campbell, *supra* note 42.

**Northwestern Journal of**
**International Law & Business**                                    40:157 (2020)

allowing the government to punish or reward its citizens.[179] These close ties further suggest that Alibaba is not intimidated by and does not fear PRC enforcement authorities. For their part, PRC enforcement authorities are reluctant to shut down or seriously harm Alibaba because such actions will lead to significant financial losses for China and the possible demise of one of the world's leading technology companies and a great source of national pride.[180]

An indication of how Alibaba continues to view itself as above the law in China is that on April 25, 2019, the USTR placed Alibaba on its Notorious Markets List for the third year in a row.[181] This designation occurred five years after the SAIC administrative guidance meeting in July 2014 and four years after the SAIC issued the White Paper detailing a plan of remediation in 2015. In its 2018 report, the USTR stated, "[a]lthough Alibaba has taken some steps to curb the offer and sale of infringing products, right holders . . . continue to report high volumes of infringing products and problems with using takedown procedures."[182] After a history of misconduct, scandals, vehement protests by brand owners, an extraordinary effort by the PRC government, and numerous blacklists by the U.S. government, Alibaba's conduct has not changed appreciably. Under these circumstances, brand owners must confront the reality that Alibaba is not likely to change its conduct without intervention by the highest levels of the Party, probably only by a personal decision by Xi Jinping, China's President and the General Secretary of the Communist Party.[183] Until senior Party leaders intervene, brand owners must accept the likelihood that Alibaba believes that it can operate outside of the law in China with impunity and without fear of government reprisals.

### *E. Amazon*

Amazon is currently the largest e-commerce marketplace in the United States[184] and is the second largest in the world, trailing only Alibaba.[185] As of 2016, the market value of Amazon exceeded that of the eight largest U.S. brick-and-mortar retailers combined, including Walmart, Target, and Best

---

[179] *Id.*

[180] This observation is based upon the author's assessment of the overall tone of the SAIC White Paper, *supra* note 31, and the transcript of the administration guidance meeting, *supra* note 141.

[181] OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, SUPRA NOTE 114.

[182] *Id.*

[183] This is the author's professional opinion based on his experience and knowledge of China. For a summary of Xi's positions, *see President Xi Jinping*, THE U.S.-CHINA BUS. COUNCIL, https://www.uschina.org/president-xi-jinping (last visited July 1, 2019). *See also #1 Xi Jinping*, FORBES, https://www.forbes.com/profile/xi-jinping/#2f2f40051601 (last visited July 1, 2019) (President Xi became the "core" leader of the Communist Party in 2016.).

[184] *See* Levy, *supra* note 107.

[185] *See id.*

Buy.[186] In December 2018, Amazon's GMV reached $239 billion.[187] One of its most popular online retail services, Amazon Prime, now has over 100 million members worldwide.[188] Amazon's official anti-counterfeiting policy states that it is the responsibility of the seller or supplier to ensure that its products are genuine, not counterfeits.[189] Two aspects of Amazon's business practices have led to a rise in online counterfeits.

Once a brand owner agrees to sell its products on Amazon's e-commerce marketplace, Amazon will source products not only from the brand owner, but also from other third-party vendors that sell the branded products. In order to have sufficient inventory on hand to satisfy customer orders expeditiously, Amazon's warehouses will co-mingle products from the brand owner and from other third-party vendors into a single source of supply.[190] If a third-party vendor ships a counterfeit product to Amazon, it becomes co-mingled with genuine products in Amazon's warehouse. When a customer orders a product online, the customer may receive a product from the warehouse from either the brand owner or a third-party vendor, which might be a counterfeit. The source of the product is not clear to the customer when he or she makes a purchase, but the customer will generally assume that it was manufactured by the brand owner.

Unable to make inroads into China's e-commerce marketplace against competitors such as Alibaba, Amazon decided in 2015 to woo Chinese manufacturers to sell directly to U.S. consumers on its e-commerce site.[191] As China is the world's largest source of counterfeits, the result was predictable: beginning in 2015, counterfeits soon began to proliferate on Amazon's e-commerce sites, much to the chagrin and exasperation of brand owners. Brand owners' complaints against Amazon also echo some of the complaints against Alibaba. For example, according to one brand owner representative, "Amazon is making money hand over fist from counterfeiters, and they've done about as little as possible for as long as possible to address the issue."[192]

---

[186] Jeff Desjardins, *The Extraordinary Size of Amazon in One Chart*, VISUAL CAPITALIST (Dec. 30, 2016), https://www.visualcapitalist.com/extraordinary-size-amazon-one-chart/.

[187] *See* Levy, *supra* note 107.

[188] Austen Hufford & Georgia Wells, *Amazon Prime Has More Than 100 Million Members*, WALL ST. J. (Apr. 18, 2018), https://www.wsj.com/articles/amazon-prime-has-more-than-100-million-members-1524088630.

[189] *Amazon Anti-Counterfeiting Policy*, AMAZON, https://sellercentral.amazon.com/gp/help/external/201165970 (last visited July 1, 2019).

[190] Pierson, *supra* note 13.

[191] Shepard, *supra* note 9.

[192] Levy, *supra* note 18.

**Northwestern Journal of**
**International Law & Business**                                    40:157 (2020)

## III. ENTITY VERIFICATION MEASURES AND THE REQUIREMENTS OF PRC LAW

The discussion in Part II centers on how the concern is different in each case, although brand owners voice similar concerns about counterfeits available on Alibaba and Amazon. The major complaint by brand owners with Alibaba is that it facilitates the sale of counterfeits in order to satiate the enormous appetite for counterfeits among China's consumers. In the case of Amazon, the major concern of brand owners is that U.S. consumers who seek to purchase genuine products are instead deceived into purchasing a counterfeit. In both cases, brand owners have expressed frustration with the lack of effective enforcement by these e-commerce platforms against webpages or postings selling counterfeits on Alibaba or Amazon's websites. These problems are further discussed below.

### A.  *Problems with Enforcement*

Although brand owners have many complaints about enforcement issues against counterfeiters on Alibaba and Amazon platforms, the crux of these complaints can be summarized as follows: (1) counterfeiters use false identities and addresses and thus are untraceable; (2) brand owners must suffer through the use of cumbersome and ineffective notice and takedown procedures; and (3) existing measures used by e-commerce platforms do not deter repeat infringing activity.

### 1.   False Names, Identities, and Addresses

Current e-commerce platforms, including Alibaba and Amazon, do not subject new sellers to adequate verification or confirmation although Alibaba is required to do so under PRC law; without an enforced verification or confirmation process, counterfeiters routinely use false or inaccurate names and addresses when registering with these e-commerce platforms.[193] When brand owners pursue counterfeiters in enforcement actions, they discover that names and addresses are fictional, and the counterfeiters then disappear into the vast expanse of cyberspace. Brand owners argue that Alibaba and Amazon have few requirements for registration and that verification of this information is not thorough or adequate. In the case of Alibaba, the SAIC White Paper stated that "only lip service is paid to credential review and registration of vendors."[194] Brand owners often complain that vendors on Amazon use fictitious names and addresses.[195]

### 2. Burdensome Notice and Takedown Procedures

E-commerce platforms create bureaucratic or technical hurdles in

---

[193] SAIC WHITE PAPER, *supra* note 31, at 13.

[194] *Id.*

[195] *See* [a hereinafter reference], *supra* note 13.

helping brand owners to locate or identify sources of counterfeits and counterfeiters.[196] These hurdles delay, frustrate, and create additional financial burdens for brand owners.[197] Both Amazon and Alibaba use a notice and takedown procedure that is based upon requirements set forth in the DMCA[198] and similar provisions in PRC law, respectively.[199] When a brand owner discovers an offending webpage or posting, the brand owner is required to submit notices to the ISP under a certain set of criteria that results in the ISP requiring the removal of an offending webpage or posting. Brand owners have described the experience of using notice and takedown procedures as "Kafka-esque"[200] and likened their use to being imprisoned in "Amazon purgatory."[201] Brand owners are required to place an order for the counterfeit goods, buy and receive the goods from the offending website, test the goods, verify that they are counterfeit, and then submit both the counterfeit and genuine product with notices documenting these actions.[202] Alibaba has a "three strikes" policy,[203] requiring proof of three completed transactions involving counterfeits and submission of notices before an offending webpage can be removed. This process can take months, is expensive, and consumes significant time and effort by the brand owner. Even when brand owners satisfy this arduous process, they complain that the notices are still often ultimately rejected for technical reasons.[204]

### 3. Lack of Deterrence

In those instances in which brand owners can achieve a takedown of the offending website or otherwise bring pressure to bear on counterfeiters, brand owners complain that once the counterfeit goods disappear, they reappear in short order on a new webpage.[205] Some brand owners refer to this process as a futile game of "Whac-A-Mole" in which a counterfeiter disappears only to immediately reemerge under a new name, identity, and location to resume its counterfeiting operations.[206] In the meanwhile, brand owners have expended significant time, effort, and money in pursuing the

---

[196] *See supra* text accompanying note 15; *see also supra* text accompanying note 101.

[197] *See* Bercovici, *supra* note 15.

[198] *See* 17 U.S.C. § 512 (Westlaw through Pub. L. No. 116-68). *See also Intellectual Property Policy for Sellers*, *supra* note 101 (Amazon); *Intellectual Property Rights (IPR) Protection Policy*, *supra* note 101 (Alibaba).

[199] *See generally* Trademark Law of the People's Republic of China, *supra* note 97; Law Against Unfair Competition of the People's Republic of China, *supra* note 97.

[200] Bercovici, *supra* note 15.

[201] *Id.*

[202] *Id.*

[203] *Enforcement Actions for Intellectual Property Rights Infringements Claims on Alibaba.com*, ALIBABA (Nov. 1, 2017), https://rule.alibaba.com/rule/detail/2043.htm.

[204] *See* Bercovici, *supra* note 15.

[205] *See supra* text accompanying note 15.

[206] Bercovici, *supra* note 15.

**Northwestern Journal of**
**International Law & Business**                                    40:157 (2020)

counterfeiting without achieving any tangible results.

## B. Proposed Remedial Measures

While counterfeiting on the Internet is a daunting problem, China provides the information technology tools that can be used to deter counterfeiters and that can address each of the three major enforcement issues faced by brand owners: false identities and addresses, convoluted notice and takedown procedures, and rampant recidivism. Most brand owners are completely unaware of or otherwise do not understand these potent tools.

### 1. AIC Business License

As part of China's extensive system of industrial and social control, a legal regime of identification and attribution of legal liability exists that can be used against counterfeiters involved in e-commerce commerce. Both in the July 16, 2014 administrative guidance meeting and in its White Paper, the SAIC repeatedly refers to Alibaba's need to control counterfeiting at the point of entry (i.e., registration on the Alibaba websites). The AICs stressed that if entry is well controlled, many of Alibaba's current problems can be solved.[207] This Article argues that brand owners should heed the advice of China's enforcement authorities and seek to have e-commerce platforms implement effective registration procedures in accordance with the specific requirements of PRC law. These measures can create prophylactic measures at the point of entry that can create an effective deterrent to counterfeiting.

Article 23 of SAIC Order No. 60, Measures on the Administration of Online Transactions ("MAOT")[208] requires business operators of online platforms to verify the legal identities of all entities or persons applying for access to their platform for the sale of products:

> The business operator of a third-party transaction platform shall examine and register as business operators the identities of the legal persons, other economic organizations or industrial and commercial sole proprietors that apply for access to the said platform for sale of products or provision of services, establish registration files and conduct regular verification and updating, and *make public the information specified in their business licenses or provide electronic links to their business licenses in eye-catching locations on its main web pages for business activities*.[209]

As set forth above, Article 23 requires the e-commerce platform to display information in the business licenses of business operators or to

---

[207] Hua Yu of Fujian Provincial AIC: "Until now, it seems that there are some difficulties in solving some problems. But in fact, if the entity is well controlled, I don't think it will be a problem." Transcript of Admin. Guidance Meeting, *supra* note 141, at 27.

[208] *See* Administrative Measures for Online Trading, *supra* note 48.

[209] *Id.* at art. 23 (emphasis added).

provide a link to their business licenses.[210] Under PRC law, every lawful business entity in the PRC must have a business license issued by the local AICs that contains the lawful business scope of the entity, its address, and the name of its legal representative.[211] All lawful enterprises must have an official, AIC-issued business license; any entity that does not have a business license cannot lawfully operate.[212]Business operators obtain a business license by applying to local AICs that review their proposed business operations to ascertain that they are lawful and economically feasible.[213] For example, if a business operator proposes to sell trademarked products, the AICs will ask for proof of a trademark registration or trademark licensing agreement.[214] The issuance of a business license means that the AICs have reviewed and approved the proposed business plan of the applicant and found it to be lawful.

Among its other functions, the business license sets forth the lawful business scope of the entity. For example, a business license might state that the entity is lawfully authorized to engage in the sale of laundry detergent or other cleansing agents for laundry. Such an entity would be acting unlawfully if it engaged in any business outside of that scope, such as, for example, the sale of peripheral equipment for computers or mobile phones. A business operator that obtains a business license for the sale of genuine products but instead sells counterfeits is in violation of its license and faces a fine or suspension of the license, which would require ceasing business operations.

The business license also prevents the business operator from using a business name and address on an e-commerce site different from that on the business license. Only the business identified in the license by its name and address is lawfully entitled to use the business license, i.e. such licenses are not transferable and cannot be used by an entity other than the one that

---

[210] *Id.*

[211] Companies Law of the People's Republic of China, ch. I, art. 7 (promulgated by the President of the PRC, Order No. 42, Oct. 27, 2005, effective on Jan. 1, 2006) ("The business license for a company shall state therein such matters as the name, domicile, registered capital, actual paid-up capital, business scope, the name of the legal representative, etc.") [hereinafter Companies Law of the PRC].

[212] *See id.* ("Company registration authorities shall issue business licenses for companies established under the law. The date of issuance of a business license for a company shall be the date of establishment of the company."). *See National Enterprise Credit Information Publicity System*, SAIC, http://www.gsxt.gov.cn/index.html (last visited July 1, 2019). *See also The 5-in-1 China Business License (WFOE/WOFE)*, FDI CHINA (July 11, 2018), https://www.fdichina.com/blog/china-company-registration/wfoe-wofe/5-in-1-business-license/.

[213] This observation is based upon the author's own experience in applying for business licenses in China. *See* Matt Slater, *What Is a China AIC?*, CHINA CHECKUP (Dec. 9, 2013), https://www.chinacheckup.com/blogs/articles/china-aic ("China AICs . . . provide official registration records for all companies in their jurisdiction[.]").

[214] The author has applied for business licenses in China and was asked by the AIC to provide proof of ownership or authorized use of trademark rights for products sold under the mark to ensure that the business had the legal right to sell the branded products.

**Northwestern Journal of**
**International Law & Business**                                        40:157 (2020)

applied for and received the business license. A business operator that has sold counterfeit goods and that has been the subject of an enforcement action cannot just simply disappear and reappear on the Internet under a different business name and address; if the name and address do not match that on the license, the use of the license is unlawful. Strictly verifying the information on the business license will prevent business operators accused of counterfeiting from disappearing and immediately reappearing under a different name and address. To use a different name and address, the business operator would have to apply for a new business license from the AIC, a process that could take months.[215]

Requiring a valid business license will preclude many underground counterfeiting factories, petty criminal organizations, smugglers, and other illegal entities from registering to sell on an e-commerce platform because such entities are unwilling to undergo scrutiny by the AICs for fear that their illegal activities will be exposed, leading to prosecution by AICs and other PRC authorities, such as the Public Security Bureau (the police). These types of nefarious entities and persons are also involved in brick-and-mortar counterfeiting; they operate illegal underground factories and have no business licenses.[216] However, without a valid business license, these entities will be unable to register on an e-commerce platform such as Alibaba in accordance with Article 23 of the MAOT.

2. Legal Representative

The business license will also contain the name of the business entity's legal representative.[217] Under PRC law, every lawful business must have a natural person who serves as the legal representative of the business entity.[218] According to PRC law, the legal representative has the clear authority to act on behalf of the business entity and can bind the business entity to contracts and other legal relationships.[219] In many cases, the chairman of the board of directors of a company or a person of a similar rank in other organizations will serve as the legal representative.[220] PRC authorities wanted to make sure that under the law, it was always clear which person within a business enterprise could sign a legally binding contract or create other legal

---

[215] This observation is based on the author's own personal experience in applying for business licenses in China.

[216] The author's own experience is that many of these counterfeiters do not operate their businesses within the boundaries of the laws and regulations.

[217] Companies Law of the PRC, *supra* note 211, at ch. I, art. 7

[218] General Principles of the Civil Law of the PRC, *supra* note 51, at ch. III, art. 38 ("In accordance with the law or the articles of association of the legal person, the responsible person who acts on behalf of the legal person in exercising its functions and powers shall be its legal representative.").

[219] *Id.*

[220] Any person can serve as a legal representative, but companies usually appoint a high ranking official.

relationships.[221] Although not specifically required by the MAOT, e-commerce platforms should require the business entity's legal representative to undergo the registration procedures so as to make certain that the business entity has lawfully committed to legal obligations created by registration.

Under PRC law, the legal representative is also personally subject to administrative and criminal liability whenever the company conducts illegal operations beyond the range approved by registration authorities, commits fraud, secretly withdraws or transfers funds, or engages in other illegal activities.[222] The existence of the legal representative ensures the PRC government that there is always a flesh and blood person who will be responsible to PRC authorities for violations of the law by legal "persons," such as a business enterprise. [223] PRC authorities did not want ultimate civil or criminal liability to rest solely with a legal fiction while natural persons escaped responsibility.[224]

By identifying a business entity's legal representative through requiring submission of its business license, e-commerce platforms such as Alibaba would provide the brand owner with a flesh and blood person against whom it can directly bring a complaint in a civil lawsuit under the PRC Trademark Law[225] or Anti-Unfair Competition Law[226] or whom the Public Security Bureau (the police) can arrest under the PRC Criminal Law.[227]

With these requirements, brand owners would not be limited to using the e-commerce platform owner's internal enforcement mechanism, such as

---

[221] General Principles of the Civil Law of the PRC, *supra* note 51, at ch. III, art. 38.

[222] General Principles of Civil Law of the People's Republic of China, Article 49:

Under any of the following circumstances, an enterprise as legal person shall bear liability, its legal representative may additionally be given administrative sanctions and fined and, if the offence constitutes a crime, criminal responsibility shall be investigated in accordance with the law:

(1) conducting illegal operations beyond the range approved and registered by the registration authority;

(2) concealing facts from the registration and tax authorities and practicing fraud;

(3) secretly withdrawing funds or hiding property to evade repayment of debts;

(4) disposing of property without authorization after the enterprise is dissolved, disbanded or declared bankrupt;

(5) failing to apply for registration and make a public announcement promptly when the enterprise undergoes a change or terminates, thus causing interested persons to suffer heavy losses;

(6) engaging in other activities prohibited by law, damaging the interests of the State or the public interest.

General Principles of the Civil Law of the PRC, *supra* note 51, at ch. II, art. 49.

[223] General Principles of the Civil Law of the PRC, *supra* note 51, at ch. III, arts. 38 & 49.

[224] *Id.*

[225] Trademark Law of the People's Republic of China, *supra* note 97.

[226] Law Against Unfair Competition of the People's Republic of China, *supra* note 97.

[227] Selling counterfeits violates Article 140 of the Criminal Law of the People's Republic of China. *See* Criminal Law of the People's Republic of China, ch. III, art. 140 (promulgated by the President of the PRC, Order No. 83, Mar. 14, 1997).

**Northwestern Journal of
International Law & Business**                    40:157 (2020)

the notice and takedown procedures. As PRC law requires that the business operator make its business license available on the e-commerce platform and as business licenses are publicly available on the AIC websites, the brand owner does not need to go through the platform owner to obtain the necessary information to directly pursue the business operator.[228] Instead, the brand owner can immediately act against the legal representative listed in the business license upon discovering an offending webpage or posting rather than be subject to the long and frustrating delays of the notice and takedown procedures. Of course, the brand owner can also use the platform owner's internal procedures in addition to bringing an action directly against the business operator through PRC enforcement authorities or, under some circumstances, in the United States if the offender has sufficient U.S. contacts.[229]

The use of an enforcement method that does not rely on the active participation of the e-commerce platform is particularly useful in the case of Alibaba, which the PRC authorities themselves have identified as viewing itself above the law. Any method of enforcement against counterfeiters that requires the active participation of Alibaba could be met with half-hearted efforts or resistance, as many brand owners have persistently suspected and complained. Directly pursuing the counterfeiter will also relieve brand owners from the burden of using Amazon's convoluted internal procedures.

## 3. Verification and Deterrence

Requiring, verifying, and displaying seller information should create an effective deterrent against selling counterfeits on Alibaba and other e-commerce platforms, since fewer counterfeit sellers would even turn to the platform in the first place if such sufficient safeguards were in place. Counterfeiters always rely on the use of false identities, false names, and false addresses because they are fearful of detection, capture, arrest, and prosecution.[230] This is true of counterfeiters who sell in brick-and-mortar outlets as well as counterfeiters who sell on the Internet. The essential tools

---

[228] A similar procedure can be used in the case of sole proprietorships that would require individuals to register, i.e. Alibaba should do a strict review of the identity card of the registrant. "A natural person who intends to engage in online product transactions shall carry out business activities via a third-party transaction platform, and submit to the third-party transaction platform his/her name, address, valid identity proof, valid contact details and other real identity information." General Principles of the Civil Law of the PRC, *supra* note 51, at ch. I, art. 7. The same principle applies: identifying the name and address of a flesh and blood person who can be held civilly and criminally responsible can be an effective deterrent against counterfeits on Alibaba websites.

[229] It would be possible to file an action against a Chinese counterfeiter in the United States only if the counterfeiter is subject to the personal jurisdiction of U.S. courts under the minimum contacts standard set forth in *Int'l Shoe v. Wash.*, 326 U.S. 310 (1945) and its progeny.

[230] This observation is based on the author's own extensive experience in pursuing counterfeiters in China and in the United States.

of the counterfeiter are secrecy, subterfuge, and artifice. The counterfeiter relies on these tools to disappear at the first sign of trouble. Denying the counterfeiter the use of these tools of secrecy and disguise would force the counterfeiter to operate openly and transparently subject to legal actions in China or in the United States, a prospect that counterfeiters abhor. Many counterfeiters would find the price of transparency and the risks of capture too high a price to pay for operating on the Internet and, as a result, will be deterred from registering on e-commerce platforms.

Currently, however, as the SAIC notes, Alibaba "only pays lip service"[231] to verifying information. The SAIC specifically criticized Alibaba for numerous careless and lax practices in its examination of business licenses that fail to verify that the entity named in the business license was the user of the license.[232] A review of the Alibaba webpages contained in the Appendix indicates the business operator has not displayed or provided access to its business license on its webpage as required by Article 23 of the MAOT.[233] At present, many individuals register on Alibaba's websites by using false identification papers, sets of which—as the SAIC noted—can be purchased on Alibaba's websites.[234] Under its guidelines, Amazon does not require online sellers from China to submit an AIC business license or identify a legal representative. Currently, Amazon only requires a business name, a telephone number, and some form of personal identification, and, as a result, many vendors provide fictitious information.[235]

## 4. Amazon and PRC Law

Although Alibaba is clearly subject to the SAIC Measures on the Administration of Online Transactions, it is arguable that Amazon is also subject to these provisions as applied to business entities in China that register on Amazon. Under traditional choice of law principles, the physical location of the business entities in China provides a basis for choosing Chinese law to govern the matter of the registration of those entities.[236] Even

---

[231] SAIC WHITE PAPER, *supra* note 31, at 13.

[232] "Some online stores that are required to upload business licenses to pass the true name authentication have an entity name, business address, residential information that apparently are not consistent with the entity name, business address or residential address on the business license. Some vendors uploaded business license information of other companies." *Id.*

[233] *See* Appendices 1-3.

[234] Transcript of Admin. Guidance Meeting, *supra* note 142, at 98.

[235] *Selling on Amazon: Frequently Asked Questions*, *supra* note 44 (requiring a business name, address, and contact information among other information in order to open an Amazon seller account); *see also supra* note 13 (brand owners find vendors provide bogus information).

[236] Under the Restatement (Second) of Conflicts of Law § 188(2), the following factors would support a finding of PRC law to govern the registration requirements: (a) place of contracting, (c) place of performance, (d) location of the subject matter of the contract, and (e) place of incorporation and place of business of the parties. Restatement (Second) of Conflicts of Law § 188(2) (Am. Law Inst. 1971).

**Northwestern Journal of
International Law & Business**                                40:157 (2020)

if choice of law rules do not dictate the application of the SAIC Measures, nothing prevents Amazon from choosing on its own, through a choice of law clause in its contracts with vendors, to follow PRC law and require each Chinese business to submit an AIC business license or a link to the license on its websites as well as requiring the legal representative to undergo registration procedures.[237] This process will allow brand owners in the United States to bring an action directly against business operators in China that use offending webpages or posts on Amazon in lieu of or in addition to pursing notice and takedown procedures. As the vast majority of counterfeits originate from China,[238] such measures could be an effective deterrent to counterfeits on Amazon.

### 5. Consent to Arbitration before CIETAC

Although not required by MAOT or other PRC law, e-commerce sites should also include in their registration procedures a clause requiring the resolution of disputes involving foreign elements by arbitration before the China International Economic and Trade Arbitration Commission (CIETAC).[239] CIETAC has its headquarters in Beijing and facilities in other cities in China and Hong Kong;[240] it lists many foreign experts among its roster of arbitrators,[241] and parties can choose English as the language of the arbitration.[242] The clause should include a provision that the business operator consents to the arbitration of disputes with the platform owner or an entity authorized by the platform owner, i.e., the brand owner.

Arbitration clauses providing for resolution of disputes by CIETAC are now commonly used by many companies to resolve international business disputes that involve China,[243] and arbitration is generally the normal method for resolving international disputes.[244] The advantage of such a clause for the brand owner is the certainty that an action can be filed against the legal

---

[237] Parties can also choose the applicable law through a choice of law provision. *See id.* § 187.

[238] *See supra* Part II.A.

[239] China Int'l Econ. & Trade Arbitration Comm'n (CIETAC) Arbitration Rules, art. 3(2) (revised and adopted by the China Council for the Promotion of International Trade and China Chamber of International Commerce on Nov. 4, 2014 and effective on Jan. 1, 2015), http://www.cietac.org/Uploads/201904/5caae5be03bb5.pdf [hereinafter CIETAC Arbitration Rules].

[240] CIETAC Arbitration Rules, *supra* note 239, art. 2(3).

[241] *Arbitrators*, CIETAC, http://www.cietac.org/index.php?g=User&m=Arbitrator&a=index&l=en (last visited July 1, 2019).

[242] CIETAC Arbitration Rules, *supra* note 239, art. 30.

[243] *See Model Clause: China International Economic and Trade Arbitration Commission (CIETAC)*, INT'L TRADE CENTR., http://www.intracen.org/Model-Clause-China-International-Economic-and-Trade-Arbitration-Commission-CIETAC/ (last visited July 1, 2019) (promoting the use of a model arbitration clause using the CIETAC).

[244] CHOW & SCHOENBAUM, *supra* note 55, at 593 (noting that arbitration is now the normal way to resolve international business disputes).

representative of the business operator with CIETAC and that CIETAC will have jurisdiction over the respondent. This will allow brand owners to move expeditiously when filing an action with CIETAC without having to deal with the uncertainty of preliminary issues such as proper notice and jurisdiction in a court-based litigation. The brand owner will also not need to suffer through the agony of waiting months required by using notice and takedown procedures.

CIETAC awards enjoy a high degree of respect and enforceability in China. PRC law requires parties to implement CIETAC arbitral awards[245] and the awards are enforceable by Chinese courts at the local level.[246] Consent to arbitration before a prestigious entity such as CIETAC would act as a further powerful deterrent to counterfeiters in China, who are used to dodging legal authorities not consenting to appear before them. The threat of being brought before CIETAC should further deter counterfeiters from registering on e-commerce platforms. For those merchants that do register, brand owners will have a quick and effective method of enforcement.

## IV. CONCLUSION

The dawn of the age of e-commerce in the new millennium opened new possibilities for legitimate commerce, but it also created vast new opportunities for illegal commerce, such as the sales of counterfeits on a previously impossible scale and level of penetration. This Article has detailed some of the daunting challenges the Internet created for brand owners and the brand owners' numerous but frustrated efforts in dealing with this potent new threat.

This study has focused on the two largest e-commerce sites in the world that dominate online retail services in China and the United States and the lessons learned can be immediately applied to other sites. The kinds of problems that brand owners face on Alibaba and Amazon are both different and similar.

The problems are different in that Alibaba facilitates the sale of counterfeits to satiate the enormous demand for counterfeits by Chinese consumers, whereas Amazon sells counterfeits on its e-commerce site to U.S. consumers who are deceived into buying a counterfeit when they sought to buy a genuine product. Together, Alibaba and Amazon can deliver a crippling one-two punch to brand owners: Alibaba facilitates the sale of counterfeits of their products to those consumers who seek them, and Amazon facilitates the sale of counterfeits to those who do not. Considering

---

[245] CIETAC Arbitration Rules, *supra* note 239, art. 55(1) ("The parties shall perform the arbitral award within the time period specified in the award. If no time period is specified in the award, the parties shall perform the award immediately.")

[246] CIETAC Arbitration Rules, *supra* note 239, art. 55(2) ("Where one party fails to perform the award, the other party may apply to a competent court for enforcement of the award in accordance with the law.")

**Northwestern Journal of**
**International Law & Business**                                    40:157 (2020)

that there are other huge e-commerce sites such as JD.com and Tencent in China and e-Bay and Groupon in the United States with similar issues, brand owners are faced with numerous dangerous threats.

The problems are similar in that brand owners find the pursuit of counterfeiters through these two e-commerce giants to be frustrating and ineffective and the direct pursuit of counterfeiters to be futile, as counterfeiters quickly vanish into cyberspace at the first sign of trouble.

Both sets of problems can be remediated through the suggested course of action set forth in this Article. However, while brand owners have made many demands to Alibaba and Amazon to streamline and improve their internal procedures for the monitoring of counterfeits and their notice and takedown procedures, to the best of the author's knowledge, no brand owner has looked closely at PRC law for help despite the urging of PRC officials.[247] Given the poor reputation of China in protecting foreign intellectual property rights,[248] this lack of trust in PRC law is understandable, but information technology tools are available that can be put to effective use. Of course, these tools were not created by the PRC with the goal of protecting foreign brand owners, but instead for the purpose of satisfying China's obsessive need to closely monitor all aspects of Chinese civil society. While China is far behind the United States in protecting intellectual property rights, China is far ahead of most countries in using information technology to monitor and supervise all aspects of Chinese civil society.[249] These tools can provide a level of effective deterrence to Chinese counterfeiters that seek to sell their illegal wares on internet commerce sites based in China or the United States. Brand owners can use the tools detailed in this Article on their own, or in conjunction with existing and developing new tools through internet commerce sites as an overall strategy of deterrence.

To be able to use the tools discussed in this Article, brand owners only need to insist on what they have every right to receive: e-commerce sites in China, such as Alibaba, must faithfully obey relevant provisions of PRC law that are simple and straightforward, an area in which Alibaba falls far short;[250] and e-commerce sites in the United States, including Amazon, should apply PRC law on entity registration of Chinese business operators

---

[247] *See supra* note 206.

[248] *See* Daniel C.K. Chow, *The Myth of China's Open Market Reforms and the World Trade Organization*, U. PENN. J. INT'L L. 8 (forthcoming 2019) (file on copy with the author).

[249] One example is China's recent social credit system, which involves assigning a social credit score indicating the desirability of a citizen's conduct to each citizen in China, a country of over 1.38 billion people. *See supra* note 42. There is also a more menacing side to China's use of technology in monitoring its citizens. Critics have argued that China has used advanced technology to create an "all seeing police state" in the rebellious Muslim-dominated area of Xinjiang Province. *See China's Hi-Tech Police State in Fractious Xinjiang a Boon for Security Firms*, S. CHINA MORNING POST (Jun. 27, 2018), https://www.scmp.com/news/china/diplomacy-defence/article/2152749/chinas-hi-tech-police-state-fractious-xinjiang-boon.

[250] *See supra* Part II.D.2.

under traditional choice of law rules, a choice of law clause, or voluntarily. Verification of entity registration should become easier with the enactment of proposed new data security legislation that would impose civil and criminal liability for the misuse of electronic information.[251] Entities that register on e-commerce sites could become liable for the use of false, misleading, or inaccurate business licenses and thus would have an additional legal incentive to use business licenses accurately.[252]

Alibaba poses a particularly formidable challenge to brand owners due to its overwhelming size and power within China and its leading role in facilitating the online sale of counterfeits. Alibaba's prodigious wealth and strength has led, in the words of PRC officials, to a culture of "arrogance."[253] Brand owners have suspected for years that Alibaba tacitly tolerates and supports counterfeiting in order to earn revenue from these sales. Recently, PRC national government authorities have confirmed these suspicions as the result of an extraordinary national-level intervention intended to discipline Alibaba. Beyond tolerating and supporting counterfeiting, Alibaba, in the words of PRC national authorities, views itself as above the law and unafraid of and not intimidated by PRC enforcement authorities.[254] In fact, the opposite seems to be the case, as the 2014 investigation of Alibaba by the SAIC indicates: government authorities are reluctant to seriously discipline Alibaba or its business due to Alibaba's exalted stature and reputation as a national paragon in China.[255] This raises a deeper issue with Alibaba for brand owners, as this attitude is unlikely to change without intervention by the highest levels of the Communist Party, a topic that deserves further scholarly exploration but is beyond the scope of this Article.

The proposed course of action described in this Article has the advantage of not having to rely on Alibaba's active participation; all that is required is that Alibaba mechanically apply the law as is required for registration of online vendors, and brand owners can on their own enforce their rights against offending parties in civil and criminal actions in China or the United States. The proposals set forth in this Article also apply to problems that brand owners face on Amazon and other U.S.-based e-commerce sites, so long as these sites apply PRC law as a result of choice of law analysis, a choice of law clause, or voluntarily. So long as Amazon follows PRC law in entity registration verification, brand owners can proceed directly with legal actions against counterfeiters and infringers in China or

---

[251] Shuju Anquan Guanli Banfa (Zhengjiu Yijian Gao) Di Si Tiao (数据安全管理办法（征求意见稿）第四条), *translated in* Security Measures for Data Security Management (Draft for Comments), art. 4, COVINGTON UNOFFICIAL TRANSLATION, https://www.inside privacy.com/wp-content/uploads/sites/6/2019/05/Measures-for-Data-Security-Management_Bilingual-1.pdf (last visited Nov. 25, 2019).

[252] *Id.*

[253] *See supra* text accompanying note 151.

[254] *See supra* text accompanying notes 151-156.

[255] *See supra* text accompanying note 182.

**Northwestern Journal of**
**International Law & Business**                                         40:157 (2020)

the United States and are not relegated to the misery of relying solely on Amazon's convoluted and cumbersome internal procedures.

Ironically, while most brand owners have focused their attention on streamlining the internal monitoring procedures of e-commerce platforms, they have ignored the more effective tools that are available in plain sight in China's legal system. By using these tools created by China's obsessive need to closely monitor and control all aspects of its civil society, brand owners can help to deter counterfeiters by forcing them to shed their concealment and anonymity and by exposing them to what they fear and loathe the most: transparency and accountability for their illegal actions.

## V. APPENDICES

*Appendix 1. Alibaba Listing: Gucci Guccio Handbags*



高端定制大牌
gucci guccio天…



¥1500

使用淘宝扫一扫

03月29日前有效

**Northwestern Journal of
International Law & Business**                    40:157 (2020)

*Appendix 2. Alibaba Listing: Hennessy XO*



轩尼诗XO干邑白
兰地 法国Henne...



¥432                            使用淘宝扫一扫

03月29日前有效

200

*Alibaba, Amazon, and Counterfeiting in the Age of the Internet*
40:157 (2020)

*Appendix 3. Alibaba Listing: Abercrombie & Fitch Sweatpants*



201

**Northwestern Journal of**
**International Law & Business**                                    40:157 (2020)

*Appendix 4. Abercrombie & Fitch Sweatpants*

